[No. B040759. Second Dist., Div. Two. Mar. 7, 1990.]

MARVIN E. WOOD, Plaintiff and Appellant, v.
LOYOLA MARYMOUNT UNIVERSITY et al., Defendants and
Respondents.

**COUNSEL**

Daniel M. Graham for Plaintiff and Appellant.

Tyre, Kamins, Katz & Granof and Barton W. Robertson for Defendants and Respondents.

**OPINION**

**FUKUTO, J.**—Plaintiff, Marvin E. Wood, appeals from summary judgment entered in favor of defendants Loyola Marymount University (the University) and Robert Arias in Wood's wrongful termination action.

Wood contends that *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] mandates the judgment be reversed. He

argues that the evidence presented to the trial court establishes that the personnel policies and practices of the University, his longevity of service (15 years), communications by the University reflecting assurances of continued employment and the "totality of the circumstances," presented triable issues of material fact as to whether the University engaged in a course of conduct which created a reasonable expectation that Wood would not be terminated except for good cause, and as to whether he was discharged for good cause.

A summary judgment may be granted where it is shown that the "action has no merit or that there is no defense thereto." (Code Civ. Proc., § 437c, subd. (a).) The court must determine from the evidence presented that "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

■ In a contract action asserting breach of a covenant not to discharge except for good cause, the plaintiff has the burden of proof at trial to show the existence of an agreement, either express or implied, not to terminate except for good cause *and* that the employer lacked good cause for the discharge. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 698, fn. 38.) ■ However, at summary judgment the burden is on the moving defendant to "negative the matters which the resisting party would have to prove at the trial." (*Segura* v. *Brundage* (1979) 91 Cal.App.3d 19, 28-29 [153 Cal.Rptr. 777].)

It is undisputed that Wood began his employment with the University in the latter part of 1969, and was terminated on June 4, 1984. His only position during that time was that of head baseball coach. Each year Wood received a letter from the University notifying him that his employment was to be continued, that his salary had been increased, and that he would continue to be eligible for certain employee benefits. The University and Arias[1] argue that these "annual appointment letters" confirm that Wood was not a "permanent" employee, but rather was hired on a year-to-year basis for a specified period of time, i.e., an academic year. As such, Wood's employment could be terminated at the end of any such period.

On May 25, 1971, Donald P. Merrifield, then president of the University, directed a memorandum to the University's "Managerial and Supervisory Staff," of which Wood was a member. The memorandum stated, "Last year, at about this time, you received your annual salary announcement in the form of a 'reappointment.' For not a few, this was confusing. Suddenly they

---

[1] Arias was the athletic director of the University and Wood's immediate supervisor.

found themselves on a year-to-year contract, after many years of continuing service to the University. [¶] Actually, the appointment of administrative staff personnel[2] is continuous from the time of the original appointment, subject, of course, to the continuing mutual satisfaction from the part of the University and the staff member with regard to performance, salary, professional opportunities, and working conditions. [¶] Thus, this year, you are receiving the enclosed notice of annual salary for the period beginning September 1, 1971. The privileges and conditions of your positions are set forth in the staff guidelines handbook for Officers of Administration and Management and Supervisory Staff, subject to such changes as the University may make in the handbook from time to time." ■ The memorandum states that Wood's employment would be continuous. At the very least, it raises a triable issue of material fact as to whether Wood was employed "year to year" as the University asserts, or whether, as Wood contends, his employment was "continuous," subject to "privileges and conditions . . . [as] set forth in the staff guidelines handbook . . . ."

The University and Arias contend that the memorandum from Merrifield indicates that Wood's employment was "expressly at-will." They rely on the language contained within the memorandum: "[T]he appointment of administrative staff personnel is continuous from the time of the original appointment, *subject,* of course, *to the continuing mutual satisfaction from the part of the University and [Wood] with regard to performance,* salary, professional opportunities, and working conditions." (Italics added.) The University views this language as an express contractual term which provides that Wood could be discharged with or without cause, and argues that since an express agreement exists showing Wood's employment to be at will, Wood can only prevail by showing a change in this express term. According to the University and Arias, Wood's claim that the University, by its own conduct and personnel policies, had agreed Wood would not be terminated without good cause would not suffice to show a change in the express term because "[t]here cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." (*Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613].)

The highlighted language in the Merrifield memorandum does not necessarily make Wood's employment expressly at will. The memorandum goes on to provide that Wood's employment was governed by policy statements set forth in the University's written guidelines handbook. The policies referred to provide that employees such as Wood would not be discharged

---

[2] The University does not contend that Wood does not fall within the category of "administrative staff personnel."

pursuant to an "arbitrary process," but rather would be dismissed pursuant to established procedures. The memorandum, when read in conjunction with the University's written policies, is consistent with a promise not to terminate except for good cause. To accept the University's argument, the effect of President Merrifield's memorandum would diminish the employment security of even a year-to-year contract that some administrative staff personnel feared resulted from "annual appointment letters." It is arguable that Merrifield's memorandum was intended to ease the concern of those who "found themselves on a year-to-year contract, after many years of continuing service to the University," and that Merrifield intended to expand the employment security of administrative staff personnel beyond year to year to continuous, subject to the personnel policies and practices of the University. Here also, there is a triable issue of fact.

Labor Code section 2922 establishes a presumption of at-will employment where, as here, the parties have made no express oral or written agreement specifying the length of employment or the grounds for termination. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 677.) ▮ However, "[t]his presumption may be superseded by [an implied-in-fact] contract . . . limiting the employer's right to discharge the employee. [Citations.]" (*Id.* at p. 665.) Wood alleges within his complaint the existence of such a contract, claiming that the University engaged in a course of conduct which created a reasonable expectation that he would not be terminated except for good cause. Wood alleges the existence of factors traditionally used to show the existence of such an implied-in-fact contract term, including " 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' [Citations.]" (*Id.* at p. 680.)

The University and Arias, describing the policies and procedures promulgated by the University as "vague," contend that Wood "leaves totally to the imagination how a generalized reference to fairness . . . in a supervisory guidebook followed by the tautological statement that termination is a last resort somehow creates an implied contract to terminate only for cause." In so arguing the University and Arias imply that Wood had the burden of proving the existence of the implied-in-fact agreement alleged within his complaint. Such is not the case. The burden was on the University and Arias to prove that an implied-in-fact agreement to only terminate Wood for good cause did *not* exist.

Wood produced evidence to show that prior to his termination he had been employed for a 15-year period, rather than as a year-to-year employee, and had received repeated oral assurances of job security, meritorious job

evaluations, consistent salary increases and bonuses during the term of his employment. More importantly, the University's published policies provide that administrative employees such as Wood would be dismissed only as a "last resort," and that dismissal would not be an "arbitrary process," but rather would be accomplished pursuant to established mandatory procedures which "have been developed to assure fair and equitable treatment to all employees."[3] The University personnel policy manual sets forth the procedures for progressive corrective action whenever an employee fails to meet required standards of performance or conduct. The manual first calls for a private informal talk by the supervisor with the employee if an employee's work is not in accordance with requirements. If an additional situation occurs, the supervisor is to warn the employee that further failure to meet job requirements will result in disciplinary action. On any subsequent recurrence, a hearing is to be conducted by the director of personnel service or assistant dean of administration and long-range planning with the supervisor, the employee and any persons involved. Any action taken is to be decided on the basis of the employee's record of employment and all circumstances of the case. The action taken can be a "reprimand" (requires discussion with the employee and an official memorandum) and, as a last resort only, release from employment. The employee is to be given advance written notice of the release action and advised of complaint and grievance rights pursuant to established procedures.

Wood presented evidence that he was terminated without warning, advance notice or any hearing. He contends he was not even told the reason for his termination prior to the commencement of this action and was not given an opportunity to rebut, deny or explain "his side of the story." Wood's first knowledge that his employment was to be terminated was in a meeting with Arias, on May 18, 1984.[4] Before this meeting, Arias had recommended and received authorization to terminate Wood from Henry Durand, the University's vice-president of student affairs and James Foxworthy, the University's executive vice-president.[5] We agree with Wood,

---

[3] The University Handbook of Staff Guidelines states: "DISMISSAL: A decision to dismiss an employee is typically one of the most difficult decisions you must make. It is normally a last resort, made only after corrective action has been unsuccessful. Dismissal, like selection, must not be an arbitrary process. Specific procedures have been developed to assure fair and equitable treatment to all employees and those procedures must be followed."

[4] Wood contends he and Arias had a personality conflict and that Arias had been orchestrating his termination for a number of years. Arias was later terminated by the University resulting in an action by him against the University for wrongful termination.

[5] Wood presented evidence that Durand (Arias's immediate supervisor), when asked by John Clewis, director of personnel services of the University, how he accounted for not following established personnel policy, stated he "[had] a problem dealing with the letter of that policy in a situation like this," and that they needed to " 'reach an amicable settlement with Mr. Wood.' "

John Clewis believed that the University had to have just cause to terminate Wood. At deposition he testified:

that the totality of the circumstances raises a triable issue of material fact whether there was an implied-in-fact agreement to terminate only for cause.

■■■ The University and Arias next contend that evidence presented to the trial court shows that the University had "cause" to terminate Wood. The University presented evidence to show that the baseball team lost 70 percent of its games during the last two years of Wood's employment. The University also presented evidence to show that four of the top five players on the baseball team who were eligible to return in 1984 had decided not to do so because "team morale was very low, the players did not respect Wood as a baseball coach, Wood had lost control of the team, and playing baseball at the University had become a thoroughly unenjoyable experience." Arias testified that, in his opinion, Wood was not able to relate to the "modern day" athlete, individuals Arias described as "[y]oung men who are growing up in our [y]uppie world." These "yuppies," according to Arias, were "much more individualistic, much more 'I' oriented." As a result, according to Arias, these "young men" wanted to be more "involved in their development," but did not want to "assume the total responsibility." One of the players who decided not to return to the University was Billie Bean, a student Arias described as one of the "modern day" athletes discussed above. According to the University and Arias, Bean's deposition testimony proves that the players, as a group, were displeased with Wood's method of coaching. As to his losing record, Wood countered with evidence indicating several good reasons why the baseball team was not a "winner" during this period of time. In January 1983, the University's "top player" was signed to a "pro contract," and as a result was not available to play during the 1983 season. Further, "five freshmen" were recruited into the program that year. As a result Wood was required to coach a "young team." In addition, the University was in the process of constructing a new sports facility causing the team to play every game that year away from home. Wood, during his last two years of coaching, was in a period of "rebuilding," developing new talent. As to the contention that good cause existed because of some players leaving the team, Wood denied the accusations and maintains that he was never given an opportunity to rebut, deny or explain his side of the story nor were any other players or former players contacted to investigate the truth of the discontented players' alleged allegations. A review of Bean's testimony reveals Bean to be a young, talented baseball player hopeful of a

"Q    And you mentioned that when Mr. Durand first informed you that he intended to terminate Mr. Wood's employment, you told him that the [U]niversity should have just cause. Do you remember saying that?
"A    No, I don't recall saying that.
"Q    Well, did you believe at the time?
"A    Yes, I did believe that."

career as a professional player. Although he expressed how eager he was to leave the University, he appeared to have been motivated to do so in order to further his career.

Most young people go to college not to receive training with which to further a career in professional sports, but rather to receive an education. Sports participation is considered, by the majority of students, to be but a small part of the overall academic experience. Team morale is not the sole responsibility of a coach. The players must assume their share of responsibility.

A coach, like any other educator, is to be judged by his overall contribution to the success of the learning institution for which he works. Wood presented evidence to show that he was not just a baseball coach, but a counselor who influenced students in important ways. For example, in 1987, one parent wrote Wood, "Our son . . . will be graduating from [the University] in May. If it wasn't for your time, wisdom and caring he wouldn't still be [at] the university. That October day in [1983], you were the one who 'coached' him through the [crisis] when he wanted to quit. Thanks to your understanding and patient advice he hung in there and now graduation is almost here. [¶] I always thought you were a good baseball coach, but I *knew* you were a fine human being!"

■ The term "good cause" is "largely relative in [its] connotation, depending upon the particular circumstances of each case." (*R. J. Cardinal Co.* v. *Ritchie* (1963) 218 Cal.App.2d 124, 144 [32 Cal.Rptr. 545].) "Essentially, [it] connote[s] 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' [Citation.]" (*Pugh* v. *See's Candies, Inc.* [*Pugh I* ] (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917].) ■ The employer does not have a right to make an arbitrary or unreasonable decision about terminating an employee when there is an agreement to terminate only for good cause. In deciding whether the employee's termination was for "a fair and honest cause or reason regulated by the good faith of the employer," the trier of fact does scrutinize the employer's business judgment and determines whether the discharge was justified under all the circumstances. If the reasons advanced by the employer for the discharge are trivial, capricious, unrelated to business needs or goals, or pretextual, the finder of fact may properly find that the stated reason for termination was not a "fair and honest cause or reason" regulated by good faith. The employer does not have an unfettered right to exercise discretion in the guise of business judgment. (*Pugh* v. *See's Candies, Inc.* [*Pugh II* ] (1988) 203 Cal.App.3d 743, 769-770 [250 Cal.Rptr. 195].) "An implied-in-fact . . . promise to dismiss an employee only for cause would be illusory if the employer were permitted to be the sole judge and final arbiter of the

propriety of the policy giving rise to the discharge." (*Crosier* v. *United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132, 1140; see also *Wilkerson* v. *Wells Fargo Bank* (1989) 212 Cal.App.3d 1217, 1232 [261 Cal.Rptr. 185].)

■ We cannot, on the record before us, conclude that there was not a triable issue of fact as to the existence of good cause for the termination of Wood's employment. ■ More importantly, however, there is a triable issue of fact as to whether the University had adhered to the termination procedures dictated by its policies and whether Wood would have been terminated at all if the University had followed the procedures, including most crucially, a hearing to allow Wood to present "his side of the story" prior to any decision to terminate him. Such personnel procedures provide a meaningful safeguard against erroneous action.

The judgment is reversed. Wood to recover costs of appeal.

GATES, J.— ■ Although I cannot agree that it lies within the province of a judge or jury to pass upon the role sports should play in a university's academic program, or the wisdom of the good faith decisions its officials may make in their implementation of that program, nonetheless, I do believe that in this instance it is a question of fact whether Loyola Marymount adhered to its own termination procedures and whether, if it did not, Wood suffered any compensable injury as a result. Consequently, I concur in the judgment.

COMPTON, Acting P. J.—I dissent.

Absent some constitutionally permissible statute regulating an employer's conduct, a private employer ought to be able to "run his own railroad" as he or she sees fit, and one of the most important factors in the success of any business is the effective selection of personnel.

For political and other reasons, most governmental employers have adopted a civil service system which generally controls the hiring and firing of employees. On the other hand, the private sector has, under our economic system, traditionally enjoyed a free hand in that area.

A private employer's personnel decisions can, of course, be limited by a mutually negotiated collective bargaining agreement or a mutually negotiated agreement with a single individual specifying, inter alia, the length of the employment and the amount of compensation.

The suggestion in some recent court decisions that somehow a binding contract of employment can be "implied" by nothing more than satisfactory

performance by the employee and praise and promotion by the employer stands traditional concepts on their heads and will discourage employers from praising or promoting employees for fear that in doing so they are locking themselves into a binding contract which neither party ever contemplated.

If a civil service concept is to be applied to the private sector, it is a matter for the Legislature under constitutional restraint and not for the courts.

Of course, if an employee, by the conduct and representations of the employer, is led to believe he or she has some form of job security and thus eschews other offers of employment or suffers some form of recognizable detrimental change of position, the doctrine of estoppel will serve to vindicate the wrong. Certainly, however, simply faithfully performing the job for which the employee is paid cannot be viewed as detrimental reliance. No estoppel is urged here.

In the case of a claimed "implied-in-fact" contract, the employee should at a minimum be required to satisfy a court as to just what the specific terms of that contract are. The questions that need to be answered are: (1) How long is the employment to last? Is it for a lifetime? Until a specified age? (2) What is the amount of compensation? Can the employee's salary be cut for any reason? Are raises required? (3) In the future, can the employee be required to do a different type of work? Can the employee be transferred? Demoted?

Obviously, the simple assertion that the employee was "led to believe" that if he satisfactorily did the job he was paid to do, he could only be discharged for "cause" answers none of these questions.

The issue of what might constitute "good cause" is also troubling. It cannot be the law that a private employer must in each case submit the soundness or wisdom of what he or she considers to be good cause for termination to the determination of a jury. This, in effect, would turn the courts into a civil service commission for employees in the private sector.

In the case at bench we simply have a private university, which desires to maintain a competitive baseball program, removing a losing coach and replacing him with one that it thinks will be a winner. The correctness or wisdom of that decision does not strike me as a question which ought to be decided by a jury.

Finally, Civil Code section 3390[1] would prevent the court from requiring the employer to restore the employee to his original position. Thus, the only remedy available for breach of the so-called implied contract is money damages. I submit that the ascertainment of those damages, under the circumstances, if at all ascertainable, would be highly speculative.

Reduced to its simplest terms, this is merely an attempt by a discharged employee to obtain court ordered "severance pay." Whether such severance pay is something which would be socially or economically desirable is a question for the Legislature, not the courts to answer. I would affirm the judgment.

Respondents' petition for review by the Supreme Court was denied May 23, 1990.

---

[1] Civil Code section 3390 provides: "The following obligations cannot be specifically enforced: 1. An obligation to render personal service; 2. An obligation to employ another in personal service."