[No. S042601. Nov. 13, 1995.]

C. BYRON SCOTT et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Appellant.

## COUNSEL

Wylie, McBride, Jesinger, Sure & Platten and Christopher E. Platten for Plaintiffs and Appellants.

Joseph Posner, Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf of Plaintiffs and Appellants.

Howard V. Colub, J. Michael Reidenbach, Deborah S. Shefler, Maureen L. Fries and Bruce R. Worthington for Defendant and Appellant.

McCutchen, Doyle, Brown & Enersen, Jonathan H. Sakol, Denise M. Derose, Mitchell, Silberberg & Knupp, Lawrence A. Michaels and Adam Levin as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**MOSK, J.**—C. Byron Scott and Al Johnson were engineers employed by Pacific Gas and Electric Company (PG&E) in a senior managerial capacity when they were demoted. The demotion resulted in an approximately 25 percent reduction in salary and benefits, as well as a loss of all supervisorial authority. They sued, claiming, among other things, that PG&E had breached an implied-in-fact contract term not to demote their employees except for good cause. The jury, in special findings, found in fact that such a contract existed and had been breached, and awarded each plaintiff a substantial amount in compensatory damages for past and anticipated future lost earnings. The trial court entered judgment for Scott and Johnson, but the Court of Appeal reversed, holding that courts should not recognize or enforce such agreements for various reasons of law and public policy. Because the Court of Appeal's conclusion contravenes well-established principles of law relating to employment contracts recognized in *Foley* v.

*Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), and in numerous cases preceding and following *Foley*, we conclude that judgment must be reversed.

## I.

At the time of trial Scott and Johnson had been employed by PG&E as engineers for 24 years and 20 years, respectively. Both had worked, before they were demoted, in PG&E's technical and ecological services unit (TES), an in-house engineering consulting service for other departments within PG&E. Scott had been director of technical services, directly below the head of the TES division, and had supervisory responsibility for 250 employees. Johnson was a supervisory engineer immediately below Scott, and supervised 56 employees.

In 1979, Scott and Johnson started S&J Engineering (S&J), a subchapter S corporation. The company consults on stress analysis, installation of strain gauges, and performs installation and calibration services. Ray Cayot, Carl Weinberg, and R. C. Thornberry, the successive managers of TES, were all informed of the existence of the company. Scott's and Johnson's involvement with S&J was well known throughout PG&E. A copy of Johnson's S&J corporate stock certificate hung on his office wall at PG&E. Employment policies at TES permitted outside consulting work, and several engineers in TES owned outside businesses. There is no PG&E rule, practice, or policy which prohibits company employees from engaging in outside businesses so long as such activity does not precipitate a conflict of interest with PG&E.

Work was done for S&J in the evenings, on vacation days and on the weekends. Much of the work was performed in Johnson's home. Some jobs were more extensive and were done on location, such as projects undertaken for the NASA Ames Research facility at Moffett Field. Some technicians who worked with Scott and Johnson at PG&E were employed on S&J's NASA projects, but they performed this work during their off hours. There is no company policy against PG&E employees hiring fellow employees in their outside businesses.

Near the end of 1988, PG&E's internal auditing department (IA) began investigation into Scott's and Johnson's supervisorial practices and outside business interests. There are conflicting explanations as to why the investigation commenced. PG&E claimed that an investigation of time card fraud earlier that year among some technicians in Scott's and Johnson's department had pointed to irregularities in their conduct. Scott and Johnson

claimed that their successful intervention on behalf of one of the employees accused during the time card fraud investigation had incurred the hostility of one of the IA investigators, Ralph Stewart, who then sought to retaliate against them. In any event, IA conducted an extensive query into Scott's and Johnson's business and personal financial records.

The charges that finally emerged from the investigation fell into two categories: (1) Scott and Johnson were negligent supervisors, failing to establish controls on employee abuses of such matters as overtime work and expense account reimbursement; (2) Scott's and Johnson's dual positions as the proprietors of S&J and as PG&E employees gave rise to a number of conflicts of interest that they resolved to PG&E's disadvantage. They were accused of using their influence to have PG&E hire and promote persons who had been employed by S&J, and also of favoring PG&E vendors who had referred business to S&J. They were also accused of misleading PG&E about the nature of S&J's activities.

On August 9, 1989, Scott and Johnson were suspended with only a brief explanation of the charges against them. They were finally permitted, on September 6, 1989, to read the IA report outlining the charges, but were not allowed to obtain copies of it. They were given three days to respond to the charges. This they did at length, and with extensive documentary support. They contended that they had used only established supervisorial practices in monitoring their employees, and that they had not, in fact, shown any favoritism toward PG&E employees or vendors. In spite of this response, Scott and Johnson were demoted in October of 1989. At trial, personnel supervisors testified that the decision to demote them had been made in July of 1989, and that their response to the IA report had not been considered in that decision. They were placed in positions they last held in 1975 and 1973 respectively, and were relieved of all supervisory authority. Their salaries and benefits were accordingly reduced by approximately 25 percent.

Scott and Johnson sued, alleging among other matters that PG&E had breached an implied contract term not to demote employees without good cause.[1] Scott's and Johnson's contract theory was based largely on PG&E's detailed personnel policies. At the time of the demotion, PG&E had a system in place termed "Positive Discipline," as set forth in a document entitled "Pacific Gas and Electric Company: Positive Discipline Guidelines," which was introduced into evidence. Positive discipline refers to a system of

---

[1]The parties, as well as the pertinent cases, sometimes refer to a demotion or termination without "good cause," or "just cause," or simply "cause." We regard these terms as interchangeable, and will refer for consistency's sake to "good cause."

progressively more serious, but constructively oriented, responses to employee misconduct. As the guidelines provide: "If an employee has a conduct, attendance or work performance problem, disciplinary action may be necessary to correct the situation. Positive Discipline is designed to provide the opportunity to correct deficient performance and build commitment (not merely compliance) to expected performance in a manner that is fair [and] equitable to all employees. Each step is a reminder of expected performance, stressing decision-making and individual responsibility, not punishment." These steps include an initial "coaching and counseling" by supervisors, followed by an oral reminder and a written reminder. The culmination of the process is a "decision making leave," in which the employee is given a paid one-day leave to consider whether he or she can make the commitment necessary to comply with PG&E's standards of conduct. Each of the disciplinary steps is to be extensively documented.

Termination occurs when "Positive Discipline has failed to bring about a positive change in an employee's behavior." Termination may also occur immediately "in those few instances when a single offense of such major consequence is committed that the employee forfeits his/her right to the Positive Discipline process," such as theft or striking a member of the public. The system is applied to all nonprobationary employees. Demotion is discussed as an intermediate disciplinary step short of discharge, particularly appropriate when the employee shows an "ability deficiency."

There was uncontradicted evidence introduced at trial that PG&E intended to bind itself to these disciplinary policies. First, the policy manual itself, of which Scott and Johnson had knowledge, enunciates the principle that the disciplinary process is intended to be uniformly applied to all employees. Second, the testimony of one of PG&E's personnel managers affirmed that PG&E expected "employees to rely on company [discipline] policies as being what the company will follow," and that one of the purposes of the disciplinary process is to "let employees know what the company expects and what employees can expect from the company." No evidence was produced that suggested the disciplinary policy was followed merely at the discretion of PG&E management.

Scott and Johnson argued at trial that PG&E had not followed its own personnel policies when it summarily demoted them without cause. The testimony of a number of witnesses showed that Scott and Johnson had not, in fact, been responsible for any favorable treatment of PG&E employees who had been employed by S&J, and that PG&E managers were unable to point to any specific instance of Scott's and Johnson's acting on a conflict of

interest to PG&E's detriment. The evidence also showed that PG&E vendors which had recommended new business to S&J had been paid finder's fees from the latter company, but had not received favors from Scott and Johnson in their capacity as PG&E employees. There was little, if any, evidence that Scott's and Johnson's work at S&J tangibly interfered with their duties at PG&E.

The jury, in special findings, found as a fact that there had been an implied contractual agreement between PG&E and Scott and Johnson not to demote without good cause, and that PG&E had breached that agreement. They awarded Scott and Johnson $700,000 and $625,000, respectively, in economic damages for past and anticipated future lost earnings from the decreased salary and benefits as a result of the demotion, and $75,000 each in noneconomic damages for emotional distress.[2] PG&E filed motions for judgment notwithstanding the verdict and a new trial, arguing among other things that there is no cognizable claim for wrongful demotion. The trial court denied all but one of PG&E's motions, ordering a new trial on the issue of the amount of emotional distress damages.

A divided Court of Appeal originally affirmed the judgment of the trial court, but on rehearing reversed. The court found a contract action for "wrongful demotion" to be inherently vague. The court also took the position that judicial involvement in employment decisions short of employee termination would create uncertainty and an unacceptable degree of intrusion into the employer-employee relationship. We granted review on the issue of whether courts may enforce implied contract terms not to demote without cause.

---

[2]The jury also found that PG&E violated Public Utilities Code section 453, subdivision (a), which prohibits public utilities, inter alia, from subjecting "any corporation or person to any prejudice or disadvantage." Plaintiffs argued that they had been treated more harshly than similarly situated employees who had committed more serious offenses. The Court of Appeal held that, as a matter of law, section 453, subdivision (a) does not apply to plaintiffs, but only to those discriminated against because of their membership in some definable class. (See *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592].) Plaintiffs do not appeal that portion of the Court of Appeal's decision, and we do not consider it here.

Additionally, the jury returned a favorable verdict on plaintiffs' alternate theory of recovery that PG&E had violated its duty of good faith and fair dealing. We also do not address that claim. Since breach of the implied-in-law covenant of good faith claim is basically a contract claim (*Foley, supra*, 47 Cal.3d at p. 700), the former claim only becomes an issue when there is insufficient evidence to find an implied-in-fact contract not to terminate or demote. In this case, we are not called on to decide what independent significance a good faith covenant claim may have, since the jury found that there was an implied-in-fact agreement not to demote.

## II.

Scott and Johnson claim that their action for breach of an implied-in-fact agreement with PG&E not to be demoted without good cause is substantially similar to an action for breach of an implied-in-fact contract not to be *discharged* without good cause that we held to be enforceable in *Foley, supra,* 47 Cal.3d at pages 675-682. PG&E contends that, for various reasons, such an implied-in-fact term should not be enforced. Before considering these arguments, we briefly review the basic principles found in *Foley* and its antecedents underlying the recognition of implied-in-fact terms in employment contracts.

In *Foley* we held that an implied-in-fact contract term not to terminate an employee without good cause, based on the employer's course of conduct and oral representations, will overcome the statutory presumption found in Labor Code section 2922 that employment for an indefinite period is terminable at will. We began our analysis by acknowledging that "courts seek to enforce the actual understanding of the parties to a contract, and in so doing may inquire into the parties' conduct to determine if it demonstrates an implied contract." (*Foley, supra,* 47 Cal.3d at p. 677.) The recognition of implied-in-fact contract provisions is part of the modern trend in contract law to reverse " 'the common law presumption that the parties' writing and the official law of contract are the definitive elements of the agreement. Evidence derived from experience and practice can now trigger the incorporation of additional, implied terms.' " (*Id.* at p. 679.) Whether the parties' conduct creates such implied agreements is generally "a question of fact." (*Id.* at p. 677.) Implied contractual terms "ordinarily stand on equal footing with express terms." (*Id.* at pp. 677-678.)

In the employment context, the application of this realistic approach to contract interpretation means that courts will not confine themselves to examining the express agreements between the employer and individual employees, but will also look to the employer's policies, practices, and communications in order to discover the contents of an employment contract. Thus, when considering a contractual wrongful termination claim, for example, "the trier of fact can infer an agreement to limit the grounds for termination based on the employee's reasonable reliance on the company's personnel manual or policies." (*Foley, supra,* 47 Cal.3d at pp. 681-682.) Enforceable expectations of employment security may also be inferred from the " 'actions or communications by the employer reflecting assurances of continued employment,' " as well as from other relevant circumstances such as longevity of service and industry practice. (*Foley, supra,* 47 Cal.3d at p.

680.) The fact that the employer's implied promises are not matched by independent consideration on the employee's part is of no significance. "[T]here is no analytical reason why an employee's promise to render services, or his actual rendition of services over time, may not support an employer's promise to pay a particular wage (for example) and to refrain from arbitrary dismissal." (*Foley*, *supra*, 47 Cal.3d at p. 679.)

The principle that implied employment contract terms may arise from the employer's official and unofficial policies and practices is one that long predates *Foley*, and has not been confined to the area of wrongful termination. As the court stated in *Chinn* v. *China Nat. Aviation Corp.* (1955) 138 Cal.App.2d 98 [291 P.2d 91], in rejecting an argument that an employer's policy to pay severance benefits was a gratuitous, unenforceable promise rather than a contractual obligation: "Of late years the attitude of the courts (as well as of employers in general) is to consider regulations of this type which offer additional advantages to employees as being in effect offers of a unilateral contract which offer is accepted if the employee continues in the employment, and not as being mere offers of gifts." (*Id.* at pp. 99-100; see also *Newberger* v. *Rifkind* (1972) 28 Cal.App.3d 1070, 1076 [104 Cal.Rptr. 663, 57 A.L.R.3d 1232] [implied unilateral contract for stock option agreement]; *Hunter* v. *Sparling* (1948) 87 Cal.App.2d 711, 721-722 [197 P.2d 807] [enforceable promise to pay pension benefits inferred from personnel policies].) In *Hepp* v. *Lockheed-California Co.* (1978) 86 Cal.App.3d 714 [150 Cal.Rptr. 408], this reasoning was extended to policies regarding nonmonetary employment benefits. There the court held that it was a question of fact whether an employer's policy of preferential hiring for its laid-off employees was to be considered an implied contractual promise on which its employees could reasonably rely. (*Id.* at p. 719.)

Conceptually, there is no rational reason why an employer's policy that its employees will not be demoted except for good cause, like a policy restricting termination or providing for severance pay, cannot become an implied term of an employment contract. In each of these instances, an employer promises to confer a significant benefit on the employee, and it is a question of fact whether that promise was reasonably understood by the employee to create a contractual obligation. (See *Foley*, *supra*, 47 Cal.3d at pp. 681-682; *Hepp* v. *Lockheed-California Co.*, *supra*, 86 Cal.App.3d at p. 719; *Burton* v. *Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972, 978 [243 Cal.Rptr. 277].)

There is, of course, a strong common law presumption that an employee may be demoted at will. Since it is presumed that an employee may be

discharged at will (Lab. Code, § 2922), the at-will presumption would surely apply to lesser quantums of discipline as well. But the employer's right to demote, like the right to discharge, is not absolute. Under federal and state law, an employee may not be demoted as the result of unlawful discrimination. (See, e.g., *Sennello* v. *Reserve Life Inc. Co.* (S.D.Fla. 1987) 667 F.Supp. 1498, affd. 872 F.2d 393 [demotion of employee due to sex discrimination violates title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.]; *Stephens* v. *Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394, 1399-1401 [245 Cal.Rptr. 606] [demotion because of age violates the state Fair Employment and Housing Act, Gov. Code, § 12900 et seq.].) The Court of Appeal, following our ruling in *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], held that an employee, who was not discharged but was wrongfully disciplined by the employer in retaliation for revealing the latter's illegal activity, may sue in tort. (*Garcia* v. *Rockwell Intern. Corp.* (1986) 187 Cal.App.3d 1556, 1562 [232 Cal.Rptr. 490].) We perceive no reason under the principles enunciated in *Foley* why the presumption that an employer has the right to demote an employee at will may not also be rebutted by evidence of a contractual agreement, express or implied, to limit the employer's power of demotion.

PG&E contends that in the present case there was insufficient evidence from which to conclude that it had entered into an implied contractual agreement not to demote its employees without cause. We disagree. When considering a claim of insufficient evidence on appeal, we do not reweigh the evidence, but rather determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [185 Cal.Rptr. 654, 650 P.2d 1171].) Here, the evidence supporting an implied agreement not to demote without cause was not merely substantial, but compelling. As discussed above in part I., PG&E had adopted a detailed system of "Positive Discipline" that was to apply to all employees, and that was known to them. There was ample evidence from PG&E's personnel policy manual, and the testimony of one of PG&E's own human resources managers, to support the view that PG&E employees had a reasonable expectation that the company would follow its own human resources policy, which had as its basic premise the disciplining of its employees only for good cause.

There was also unquestionably substantial evidence to support the conclusion that PG&E breached the implied contract not to demote without good

cause. The evidence could be reasonably interpreted to conclude that Scott and Johnson committed no significant conflict of interest violations, and that arguably they had been guilty at most of creating certain appearances of impropriety in the conduct of their business at S&J. It was further reasonable for the jury to determine that PG&E, pursuant to its personnel policies, was obliged to afford Scott and Johnson the opportunity to cure these relatively minor offenses through the positive discipline process, but that it failed to do so, owing in part to a personal animus against them by certain PG&E officials. The jury therefore reasonably concluded that PG&E had breached its implied contractual agreement by wrongfully demoting Scott and Johnson.

Our inquiry would normally end here. But PG&E raises several legal and policy arguments why courts should not enforce contracts, or at least implied-in-fact contracts, that would restrict an employer's ability to demote an employee at will. It is to these contentions that we now turn.

III.

PG&E advances essentially three arguments, all of which were relied on by the Court of Appeal, why contractual agreements that limit an employer's ability to demote at will should not be enforced. As will appear, we find that none of PG&E's contentions withstand scrutiny.

■ First, PG&E cites *Ladas* v. *California State Auto. Assn.* (1993) 19 Cal.App.4th 761 [23 Cal.Rptr.2d 810] (*Ladas*) for the proposition that many terms in employment contracts are inherently vague and incapable of enforcement. In *Ladas*, plaintiff insurance sales representatives sued their company for failure to pay commissions comparable to those received by sales agents at other insurance companies. They claimed that this lack of parity conflicted with statements in the employee handbook decreeing a company policy to " '[p]rovide employment at a wage which compares favorably with prevailing community rates for similar work under comparable conditions requiring like responsibility, experience, effort and skill.' " (*Id.* at p. 768.) The plaintiffs conceded that the company had never bound itself to pay its sales representatives what agents from other companies were receiving, but merely that evidence of other companies' compensation was one factor that the company would "consider" in computing its formula for paying commissions. (*Id.* at p. 770.) The court held that the promise was too vague to be enforceable: "An amorphous promise to 'consider' what employees at other companies are earning cannot rise to the level of a contractual duty. . . . By what standard would a court or a jury determine that the

company failed to meet its obligation to 'consider' commissions earned by competitors?" (*Id.* at p. 771.)

The *Ladas* court thus applied the well-established principle that " '[a]lthough the terms of a contract need not be stated in the minutest detail, it is requisite to enforceability that it must evidence a meeting of the minds upon the essential features of the agreement, and that the scope of the duty and limits of acceptable performance be at least sufficiently defined to provide a rational basis for the assessment of damages. . . .' " (*Robinson & Wilson, Inc.* v. *Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675].) It is unquestionably true, as *Ladas* demonstrates, that a number of promises made in the employment relationship are too vague to be enforceable. But PG&E does not explain how that principle applies to the promise at issue here. Once the trier of fact determines that there is an implied agreement not to demote without good cause, its inquiry into whether "good cause" exists is virtually identical to the inquiry it would be called on to make in the wrongful discharge context and in a host of other contractual settings. The term "good cause" "[e]ssentially . . . connote[s] 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power' " (*Pugh* v. *See's Candies, Inc.* (1981)116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917]), as opposed to one that is "trivial, capricious, unrelated to business needs or goals, or pretextual . . . ." (*Wood* v. *Loyola Marymount University* (1990) 218 Cal.App.3d 661, 670 [267 Cal.Rptr. 230]; see also *Walker* v. *Blue Cross of California* (1992) 4 Cal.App.4th 985, 994-995 [6 Cal.Rptr.2d 184]; *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 769-770 [250 Cal.Rptr. 195].)

Moreover, PG&E's discipline policies not only provided an implied good cause standard for demotion, but also a detailed set of rules and procedures for governing the imposition of discipline that further defined the meaning of that standard. These rules and procedures were sufficiently clear to permit a trier of fact to determine whether the company had complied with them.

Accordingly, PG&E's implied promise not to demote without good cause and to follow certain disciplinary rules was not unenforceably vague.

Second, PG&E argues that its position is supported by our recent statement in *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1247 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*) that "a poor performance rating or demotion, even when accompanied by a reduction in pay, does not by itself trigger a constructive discharge." (Fn. omitted; see also *Gibson* v. *Aro Corp.* (1995) 32 Cal.App.4th 1628, 1635 [38 Cal.Rptr.2d 882] [employee's demotion does not constitute constructive discharge]; *Soules* v. *Cadam, Inc.*

(1991) 2 Cal.App.4th 390, 401 [3 Cal.Rptr.2d 6] [same].) PG&E contends that to permit a contract action for wrongful demotion would undermine *Turner* by permitting employees to sue their employers for adverse disciplinary actions that do not rise to the level of a constructive discharge.

*Turner*, however, is inapposite. As discussed in that case, the doctrine of constructive discharge evolved as a means of preventing employers from making an " 'end run[ ]' around wrongful discharge and other claims requiring employer-initiated terminations of employment." (*Turner, supra,* 7 Cal.4th at p. 1244.) Courts have recognized that a constructive discharge occurs when an employer " 'purposefully creates working conditions so intolerable that the employee has no option but to resign . . . .' " (*Id.* at p. 1245, quoting *Sure-Tan, Inc.* v. *NLRB* (1984) 467 U.S. 883, 894 [81 L.Ed.2d 732, 744, 104 S.Ct. 2803]; italics in *Turner* omitted.) Those who sue for constructive discharge seek the same contract damages available to those who have suffered a conventional wrongful termination, i.e., the entire amount of salary that would have been earned, including reasonably anticipated future earnings, less the amount that has been earned or might reasonably have been earned from other employment. (See *Parker* v. *Twentieth Century Fox-Film Corp.* (1970) 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615]; *Drzewiecki* v. *H & R Block, Inc.* (1972) 24 Cal.App.3d 695, 705 [101 Cal.Rptr. 169].)

In the present litigation, in contrast, Scott and Johnson did not quit, and do not claim that they were constructively discharged. The damages they sought were accordingly more modest—not the past and anticipated loss of their entire salary, but merely the difference in compensation before and after the demotion.[3] *Turner* and the other constructive discharge cases did not create a new rule of contract law that an employee who has not been discharged can sue an employer for breach of an employment contract *only if* the employer's breach creates conditions so intolerable that the employee is compelled to quit. That requirement is imposed only in the singular situation of the employee who voluntarily leaves his employment and then sues to recover damages for wrongful termination. Such is not the case here.

■ Finally, PG&E argues that an implied-in-fact agreement not to demote for cause is unenforceable for reasons of public policy. Before discussing the merits of this argument, a review of the general principles governing public policy limitations on the enforcement of implied employment contracts is appropriate. ■ As we recently declared, an implied-in-fact employment contract claim "is rooted in the conduct of the parties to

---

[3]*Turner* did not hold, nor to we hold today, that a demotion can never be the basis for a wrongful termination. The question whether a demotion may be so drastic or punitive as to constitute a constructive discharge is not before us.

the employment relationship itself. As such, it is a branch of the law of contracts and subject to the time-honored notion that contractual bargains ought to be enforced unless there is some imperative—generally rooted in policies external to the employment relationship—that prevents a court from doing so." (*General Dynamics Corp.* v. *Superior Court* (1994) 7 Cal.4th 1164, 1177 [32 Cal.Rptr.2d 1, 876 P.2d 487] (*General Dynamics*).)

In *Foley*, we rejected the conclusion of the Court of Appeal that employment security agreements are contrary to public policy because they appear "so inherently harmful . . . to employers" that they should not be enforced. (*Foley, supra,* 47 Cal.3d at p. 680.) "On the contrary, employers may benefit from the increased loyalty and productivity such agreements may inspire. . . . We see no sound reason to exempt the employment relationship from the ordinary rules of contract interpretation which permit proof of implied [contract] terms." (*Foley, supra,* 47 Cal.3d at p. 681.) Similarly, in *General Dynamics* we held that, in spite of a strong policy favoring the capacity of clients to terminate their attorneys' services at will, a client/employer is nonetheless bound by an implied-in-fact contract term to discharge an attorney/employee only for good cause. (*General Dynamics, supra,* 7 Cal.4th at pp. 1178-1179.)

Here, too, we do not find implied contract terms to demote employees only for good cause "so inherently harmful to employers that they should not be enforced." On the contrary, according to the testimony at trial of one of PG&E's human resources managers, PG&E created a comprehensive system of positive discipline in order to more effectively manage the company, create a more efficient and independent workforce, and protect employees against the arbitrary actions of supervisors. There appears to be, indeed, widespread support among scholars and practitioners in the field of human resources management for the position that employee discipline should be governed by basic principles of due process. (See, e.g., Redeker, Employee Discipline: Policies and Practices (1989) pp. 106-124 (Redeker); Belohlav, *Realities of Successful Employee Discipline* (Mar. 1983) 28 Personnel Administrator 74; Discenza & Smith, *Is Employee Discipline Obsolete?* (June 1985) 30 Personnel Administrator 175, 177-178; Heshizer & Graham, *Discipline in the Nonunion Company: Protecting Employer and Employee Rights* (Mar.-Apr. 1982) 59 Personnel Administrator 71, 77-78; Levy, *Discipline for Professional Employees* (Dec. 1990) Personnel J. 27, 28; *Employee Discipline: Written Guidelines Protect Employees and Management* (Oct. 1987) Small Bus. Rep. 37, 37-38.) One commentator has outlined four advantages that a corporation may derive from incorporating such due process into the disciplining of its employees: (1) a more productive, responsible work force

committed to the enterprise; (2) avoidance of union interference; (3) avoidance of litigation based on statutory civil rights laws or common law wrongful termination claims; and (4) the provision of incentives to retain current employees and attract new ones. (Redeker, *supra*, at p. 106; see also Osigweh & Hutchinson, *Positive Discipline* (Fall 1989) 28 Human Resources Mgmt. 367, 382 [adoption of positive discipline system leads to reduced absenteeism]; Campbell et al., *Discipline Without Punishment—At Last* (July-Aug. 1985) 63 Harv. Bus. Rev. 162, 163 [same].)

Whatever the benefits or detriments of adopting a disciplinary system governed expressly or implicitly by some sort of rule of law, we cannot say that an employer's voluntary commitment to such a policy is contrary to public policy. Nor can we say that it is against public policy to apply ordinary rules of contract interpretation to determine whether these disciplinary procedures have become implied terms of the employment contract.

PG&E claims in effect that even if the enforcement of an implied agreement governing employee demotion is not, in itself, so inherently harmful to the employer as to be contrary to public policy, the recognition of wrongful demotion actions will inevitably open the door to lawsuits concerning a whole host of lesser employment decisions, leading to excessive involvement of courts and juries in the workplace. PG&E cites our observation in *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 [233 Cal.Rptr. 308, 729 P.2d 743] that "every employer must on occasion review, criticize, demote, transfer and discipline employees." It then argues that if we do not draw the line at wrongful termination, and recognize an implied contract action based on lesser employee grievances such as wrongful demotion, then "every act or omission regarding performance evaluations, promotions, transfers, or other perquisites would be subject to judicial determination as to whether the policy or practice at issue contained an implied 'good cause' promise," which would lead to a judicial "invasion into the employers' exercise of managerial discretion."[4]

PG&E appears to argue implicitly that courts should engage in a kind of balancing of the employer's and the employee's interests to determine

---

[4]PG&E cites in support of its position cases interpreting the law of Michigan, apparently the only other jurisdiction to consider the question of implied contract actions for wrongful demotion. In *Baragar* v. *State Farms Ins. Co.* (W.D.Mich 1994) 860 F.Supp. 1257 (*Baragar*), the court concluded that an insurance sales representative who was demoted could not sue on an implied contract theory, although the Michigan Supreme Court had recognized such a theory for wrongful termination in *Toussaint* v. *Blue Cross & Blue Shield* (1980) 408 Mich. 579 [292 N.W.2d 880, 885] (*Toussaint*). The *Baragar* court cited the more recent Michigan Supreme Court case of *Dumas* v. *Auto Club Ins. Ass'n* (1991) 437 Mich. 521 [473 N.W.2d 652, 655], which held *Toussaint*'s implied contract doctrine did not apply to constrain an employer's ability to reduce the compensation of its sales employees. The *Baragar* court reasoned that while a termination is a form of " 'economic capital punishment[,]' . . . cutting

whether to enforce employment contracts—at least implied contracts. According to this contention, courts may enforce implied contractual agreements prohibiting wrongful termination because the employer's interest in exercising discretion in the workplace, and society's presumptive interest in minimizing judicial interference in the workplace, are offset by the employee's substantial interest in not being unjustly dismissed, and society's interest in remedying and preventing such unjust dismissal. But when the employee's interest is less substantial, as in the case of a wrongful demotion, it is urged that courts should decline to enforce these implied terms, giving more deference to employer discretion.

The fallacy behind this argument is basic. ■ While courts have engaged in a balancing of interests when defining the scope of common law tort duties (see, e.g., *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 990-994 [25 Cal.Rptr.2d 550, 863 P.2d 795] [potentially high social costs of permitting negligence actions for causing "fear of cancer" justifies imposition of a heightened threshold of liability], when the action is in contract, we defer to the parties themselves to balance the costs and benefits of adopting particular contractual terms—or, in the case of implied employment contracts, to the employer's determination of what rights and benefits it will voluntarily offer to its employees. Thus, courts will generally enforce contract terms, unless they are either illegal or else are so manifestly one-sided, usually to the benefit of the stronger or more knowledgeable party, as to render them unconscionable. (See, e.g., *Schaefer* v. *Williams* (1993) 15 Cal.App.4th 1243, 1247 [19 Cal.Rptr.2d 212] [contract based on illegal consideration void]; *Ellis* v. *McKinnon Broadcasting Co.* (1993) 18 Cal.App.4th 1796, 1804-1806 [23 Cal.Rptr.2d 80] [unconscionable term unenforceable]; *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 486-487 [186 Cal.Rptr. 114, 38 A.L.R.4th 1] [same].) No such illegality or unconscionability is at issue here.

---

a coffee break from 15 minutes to ten minutes, reducing compensation of an individual employee or group of employees, or demoting an employee, while hurtful, is not as severe. Although a demotion might hurt one's pocketbook and pride, in this court's judgment it is closer to a cut in pay . . . [than] economic capital punishment . . . . We live in a very competitive age where being able to make quick management decisions and adjustments often *determines* the . . . success of a business." (*Baragar, supra,* 860 F.Supp. at p. 1262, italics in original.)

However, Michigan Courts of Appeals appear divided on the question of wrongful demotion. At least one court has held that a wrongful demotion in violation of company policy was a viable cause of action, which the court characterized as a "wrongful termination" from the job from which the employee had been demoted. (*Richards* v. *Detroit Free Press* (1988) 173 Mich.App. 256 [433 N.W.2d 320, 322], remanded on other grounds (1989) 433 Mich. 913 [448 N.W.2d 351].) Another court held, without explanation, that the Michigan Supreme Court's holding in *Toussaint* did not apply to wrongful demotions. (*Fischhaber* v. *Gen. Motors Corp.* (1988) 174 Mich.App. 450 [436 N.W.2d 386, 389].)

PG&E's policy argument is also based on the factually unfounded premise that judicial enforcement of the terms of employment contracts has been confined to the domain of wrongful termination. As discussed above, courts have long been involved in enforcing implied terms pertaining to a variety of employment benefits. PG&E does not explain why we should recognize implied contracts in these areas and not in the area of demotion.

Moreover, at the heart of PG&E's argument is a predictive claim that we find to be highly dubious—that unless courts refuse to enforce implied contractual terms to demote only for cause, they will become embroiled in numerous lawsuits over trivial employment matters. The assertion overlooks the fact that traditional principles of contract law provide both employers and courts with a number of tools for preventing such judicial overinvolvement in the employment relationship. First, and fundamentally, employers have the capacity to alter their policies and practices so as not to create unwanted contractual obligations. PG&E contends that employers may not be able to exercise such control over their implied-in-fact promises—that colorable implied contract claims for wrongful discipline or deprivation of certain employee benefits will invariably arise from casual promises made by supervisors, or from other practices that are beyond the control of company management. We disagree. Without deciding today questions not before us, such as the effect of various types of disclaimers in employment contracts or policy manuals (see *Foley, supra,* 47 Cal.3d at p. 680, fn. 23), we nonetheless find no basis to the argument that employers who consistently articulate and implement policies designed to preserve their traditional managerial prerogatives lack the capacity to limit their exposure to implied contractual liability. (See generally, Wilcox et al., Cal. Employment Law (1995 ed.) § 60.05(2)(e), p. 60-76.4.)

Second, as suggested above in the discussion of *Ladas, supra,* the doctrine of unenforceability of indefinite promises will likely eliminate many employment contract claims that would involve courts in the micromanagement of the workplace. The utility of this doctrine is further illustrated by *Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201 [23 Cal.Rptr.2d 793]. In that case, the court concluded that promises allegedly made to a former senior executive for the Walt Disney Company that he was to receive "reasonable salary increases" and "reasonable annual bonuses," and would "actively and meaningfully participate in all . . . creative activities" of the department to which he was assigned were not cognizable as contract claims: "Assuming such commitments were made, they are simply too vague and indefinite to be enforceable. For example, promises to pay salary increases which are 'appropriate' to [the plaintiff's] responsibilities and performance or that [the

plaintiff] would have an 'active and meaningful' participation in creative decisions are not capable of enforcement in a court of law." (*Id.* at pp. 213-214; see also *Ladas, supra,* 19 Cal.App.4th at pp. 771-772.) In other words, courts will not enforce vague promises about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise. It is to be expected that many alleged employer promises will be unable to cross this threshold of definition to become enforceable contract claims.

Finally, we find implausible PG&E's claim that employees will bring their employers to court over the more minor matters that PG&E predicts—such as changes in work rules, reprimands or other intermediary forms of discipline—for the simple reason that in such cases, even if the promises are sufficiently definite to permit enforcement, courts will be unable to grant any significant relief. An employer's alleged violation of these minor contract terms will likely not give rise to ascertainable damages. ■ " 'It is fundamental that [contract] damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.' " (*McDonald* v. *John P. Scripps Newspaper* (1989) 210 Cal.App.3d 100, 104 [257 Cal.Rptr. 473].) Absent a definable loss, a party is entitled only to nominal damages. (*Ericson* v. *Playgirl, Inc.* (1977) 73 Cal.App.3d 850, 859 [140 Cal.Rptr. 921, 96 A.L.R.3d 427].

■ It is also well established that an employee is generally not entitled to compel the specific performance of the terms of an employment contract, absent statutory authorization. (See Civ. Code, § 3390; *Barndt* v. *County of Los Angeles* (1989) 211 Cal.App.3d 397, 403-404 [259 Cal.Rptr. 372] [physician transferred from cardiology unit to another department in violation of a settlement agreement cannot specifically enforce agreement]); see also *General Dynamics, supra,* 7 Cal.4th at p. 1178 [discharged in-house attorney suing for implied breach of contract may have a right to damages, but not to reinstatement].) Accordingly, we doubt that the floodgates of litigation will be opened by employees seeking to sue their employers for recovery of, at most, nominal damages. Such actions would be counterproductive to future employment relations.

■ In sum, we do not accept PG&E's contention that implied employment contract terms outside the realm of wrongful termination should not be enforced in order to prevent courts and juries from intruding too far into the workplace. The employer's ability to control the terms of the employment contract, as well as the application of traditional contract doctrines regarding indefinite contract terms, speculative damages, and the limitation on equitable remedies, are sufficient to prevent such excessive judicial entanglement.

But when, as here, there is substantial factual evidence of the existence of a contract not to demote without good cause, breach of that contract, and significant, ascertainable pecuniary loss as a result, there is no reason for courts to refrain from awarding damages.[5]

## IV. DISPOSITION

For all of the foregoing, the judgment of the Court of Appeal is reversed and remanded with directions to reinstate the judgment of the trial court.

Lucas, C. J., Kennard, J., Arabian, J., George, J., Puglia (Robert K.), J.,* and Cottle (Christopher C.), J.,† concurred.

---

[5]PG&E also cites *Tollefson* v. *Roman Catholic Bishop* (1990) 219 Cal.App.3d 843 [268 Cal.Rptr. 550] in support of its position that courts do not recognize an action for wrongful demotion. In that case the plaintiff, a teacher in a Catholic school, was appointed to a one-year position as an administrator, with the express agreement that the position would be terminable at will by either party at the end of the year. The school administration did in fact terminate plaintiff's employment after one year, and she accepted the school's offer to be employed again as a teacher. She sued the school on a claim of a breach of implied contract and the covenant of good faith and fair dealing. The Court of Appeal, in affirming the trial court's grant of summary judgment for the defendant school administration, held that neither claim was valid in light of the express one-year contract. The court also stated in dictum that the plaintiff's action could be more properly characterized as a "wrongful demotion" rather than a "wrongful termination," and that "there exists no California precedent warranting either contractual or tortious relief under these circumstances." (*Id.* at p. 853, fn. 3.) Inasmuch as this dictum can be understood to signify that an implied-in-fact contract not to be demoted without cause cannot be legally enforced in this state, we hereby disapprove it.

*Presiding Justice, Court of Appeal, Third Appellate District, assigned by the Acting Chairperson of the Judicial Council.

†Presiding Justice, Court of Appeal, Sixth Appellate District, assigned by the Acting Chairperson of the Judicial Council.