[No. C053553. Third Dist. May 13, 2008.]

LISA STEELE, Plaintiff and Respondent, v.
YOUTHFUL OFFENDER PAROLE BOARD, Defendant and Appellant.

**COUNSEL**

Edmund G. Brown, Jr., Attorney General, David S. Chaney, Chief Assistant Attorney General, Jacob A. Appelsmith and Alicia M. B. Fowler, Deputy Attorneys General, for Defendant and Appellant.

Law Offices of Anthony J. Poidmore and Anthony J. Poidmore for Plaintiff and Respondent.

**OPINION**

**CANTIL-SAKAUYE, J.**—The Youthful Offender Parole Board (YOPB) appeals the judgment finding it liable under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1] for retaliation against

---

[1] Hereafter, undesignated statutory references are to the Government Code.

Lisa Steele (plaintiff or Lisa)[2] and awarding her $9,046 in past economic damages. The YOPB also appeals the trial court's postjudgment order granting plaintiff $146,705 in attorney fees as the prevailing party in her FEHA action.

The YOPB contends the FEHA judgment must be reversed because (1) there is insufficient evidence plaintiff suffered a constructive discharge from her employment with the YOPB and, thus, she suffered no "adverse employment action" as required for her FEHA retaliation claim, and (2) there is insufficient evidence of a causal link between plaintiff's protected activity and the alleged adverse employment action. The YOPB contends the order granting attorney fees must be reversed once the underlying judgment is reversed. We conclude substantial evidence supports the judgment and therefore, affirm both the judgment and the order awarding fees.

## FACTUAL BACKGROUND

Anthony Peacock was a longtime California state employee. In May 1999 he left his permanent position at the office of the Secretary of State, after being there for 17 years, in order to take a two-year limited-term position at the YOPB that offered a slight pay increase and more interesting work.[3] As Peacock wanted to make his position at the YOPB a permanent position, he hired his friend Robert Steele, whom he had known through their mutual state employment since 1974, as a retired annuitant to complete the necessary paperwork. The personnel proposal completed by Steele successfully persuaded the Department of Personnel Administration to make Peacock's position permanent.

Peacock then mentioned to Steele a clerical vacancy at the YOPB that might be a good opportunity for Steele's daughter Lisa. Lisa had an interest in criminal justice, wanted a long-term career with the state, and at that point had been working for approximately two months at the Department of Justice.

Lisa started working for the YOPB as an office assistant/receptionist in January 2001. She completed her six-month probationary period without any problems and never received any criticisms of her job performance. Lisa did

---

[2] To avoid confusion between plaintiff Lisa Steele and her father Robert Steele, both of whom testified at trial, we will sometimes refer to plaintiff by her first name. We will refer to her father as "Steele." We mean no disrespect.

[3] Peacock had been contacted about the limited-term position opening by Lisa Beutler, who was at the time the undersecretary of the Youth and Adult Correctional Agency (YACA), the parent agency over the YOPB. Robert Presley was the secretary of the YACA.

her job, was intelligent, capable of complex tasks, and asked others if she could help them with their tasks when she ran out of work.[4]

In October 2001, Lisa competed in three bikini contests held by a local radio station. On the day of the last contest, Raul Galindo, chairman of the YOPB, came up to Lisa at work and said he had heard she was doing bikini contests. He asked if she was going to do another one and Lisa told him there was one scheduled for that night. At his request, Lisa provided Galindo directions to the contest. Galindo showed up at the contest before it began. After the contest, Lisa went over to Galindo to thank him for coming. As she was saying goodbye, Galindo leaned in to kiss her on the mouth. Lisa turned her head so that she received the kiss on her cheek. Lisa was taken aback, but not offended.

Lisa and her boyfriend got into a physical altercation later that night and Lisa was injured. She called into work the next day and spoke to a coworker, Jeannie Cerrito. Lisa told Cerrito she was not coming in and why. Lisa mentioned the kiss incident to Cerrito. Lisa also talked to her then supervisor, Shelley Jones, and told her about the fight with her boyfriend.

Cerrito told another coworker, Kym Kaslar, about the bikini contest, the fight between Lisa and her boyfriend, and the incident where Galindo grabbed Lisa and kissed her.

Peacock heard about the kissing incident from Cerrito and on October 23, 2001, interviewed Kaslar regarding her knowledge of what had happened at the bikini contest. Kaslar told him about the altercation between Lisa and her boyfriend and said she also knew about Galindo being at the contest and kissing Lisa. Peacock shut down very quickly and told Kaslar to go back into the office and keep her mouth shut. Peacock told Kaslar that what she knew could get Galindo fired, as well as get her into trouble. It could cost her her job.

As soon as Susan Wallace, the executive officer of the YOPB, came into the office that morning, Peacock told her about his conversation with Kaslar. Wallace told Peacock to talk to Lisa to find out what happened.[5] Wallace and Peacock were both concerned Galindo's actions had the appearance of

---

[4] This assessment of Lisa's work was disputed. Shelley Jones, one of Lisa's coworkers at the YOPB and her supervisor for several months in the autumn of 2001, testified Lisa's work performance was in fact lacking during Lisa's probation period. According to Jones, Lisa rarely did what she was asked to do and what she did, she did incorrectly.

[5] Peacock later questioned Lisa about the kiss incident. Lisa testified she confirmed Galindo had tried to kiss her, but told Peacock she did not take offense to it. Peacock claimed Lisa told him the kiss incident did not happen.

impropriety. Galindo was a political appointee whose term was set to expire in seven months, May 2002, at which time he was subject to reappointment by the Governor's office and confirmation by the state Senate. Galindo had been elevated from board member to chairman of the YOPB by Robert Presley at the suggestion of Wallace. Wallace reported the incident to Presley, the secretary of YACA, and discussed it with Beutler, the undersecretary of YACA, because it was politically sensitive. Wallace also had a pending application to be appointed as a judge by the Governor. Peacock had aspirations for promotion at the YOPB.[6]

Peacock drafted a letter to Galindo for Presley's signature at the suggestion of Wallace and as approved by Beutler. On October 25, 2001, the letter signed by Presley was sent to Galindo. The letter stated in pertinent part: "It has come to my attention that it has been alleged that you were involved in a social situation of questionable taste with a member of the YOPB staff. [¶] I want to make it perfectly clear that under no circumstances is fraternizing with staff considered acceptable behavior in this Administration. [¶] In order to be crystal clear about the expectations of this Administration regarding appropriate contacts with staff, I have directed the YOPB Executive Officer to enroll you in a course on Sexual Harassment. . . . [¶] . . . [¶] It is my sincere hope that no incidents of this nature come to my attention ever again."

On October 25, 2001, Peacock called Kaslar into his office again. Peacock told Kaslar she was no longer to have any contact with any of the board members or the chairman (Galindo). Peacock threatened Kaslar with adverse action if she said anything.

On October 31, 2001, Kaslar filed a complaint with the State Personnel Board in which she claimed, in part, unlawful retaliation by Peacock based on her disclosure of the kissing incident between Galindo and Lisa. She said Peacock told her it could cost Galindo and her their jobs.[7]

On November 6, 2001, Lisa met with her then supervisor, Jones. Jones criticized Lisa's work performance in the areas of her work schedule, her maintenance and organization of travel and attendance records, her need to notify Jones if she needed additional work, her conduct of personal business at her desk, and her installation of America Online (AOL) on her workstation computer in violation of state policy. These criticisms were memorialized in a three-page memorandum to Lisa dated November 7, 2001. Lisa was very

---

[6] In 2003, Wallace told Peacock she would "put in a good word for [him]" to become executive officer of YOPB if she left.

[7] At trial, Peacock claimed he first saw Kaslar's complaint when it was served on the YOPB on January 23, 2002. The complaint had been misdirected to at least one other agency before it was sent to the YOPB.

upset by the memo. She believed it was inaccurate and contained numerous false accusations. At the suggestion of her father, Lisa prepared a written response addressing each area of criticism. On November 14, Jones sent another memo to Lisa criticizing both Lisa and her November 9th response to Jones's first memo.

Lisa brought both of Jones's memos to the attention of Peacock, telling him they contained false accusations. Lisa's father also talked to Peacock about Jones's memos to Lisa. Peacock agreed the memos were unfair, excessive and inappropriate. Peacock told Steele that as a new supervisor, Jones was a little "nit-picky," but the memos did not constitute a performance issue or grounds for discipline. Jones was basically trying to establish her authority as supervisor. Peacock told Lisa he would speak to Jones about the matter and told Steele he would get Lisa and Jones together to resolve their personality conflict. He did neither.

In early November 2001, Peacock told Lisa and Kaslar that there might be budget cuts in the future, and that it might be in their best interests to look for other jobs. Peacock did not warn any other YOPB employees to look for other jobs. He claimed he met with only Lisa and Kaslar because they were the least senior in the office.

On November 19, 2001, Jones gave Lisa a "letter of instruction" for reinstalling AOL on her computer.[8] A letter of instruction is the first step in progressive discipline under state civil service. The letter of instruction was not placed in Lisa's personnel file, but kept by Peacock in his supervisor's file for future reference. According to Peacock, the steps for progressive discipline went from a letter of instruction to a formal letter of reprimand to suspension, short then long, to finally, termination. At each step of the process, the employee has a right to a hearing before an independent officer to review the discipline. Lisa did not request a hearing with respect to the letter of instruction.

In December 2001, Wallace made comments to Kaslar, similar to those of Peacock, warning her to not say anything about the Galindo/Lisa kissing incident. Wallace told Kaslar she "wouldn't be in this situation if you just kept your mouth shut and stayed out of office politics and left the clerical people alone." At that time, Lisa was the only clerical person at the office.

---

[8] Lisa admitted installing AOL on her computer during the summer of 2001. She claimed she had asked Peacock about it and he said he did not see a problem since Wallace had it installed on her computer. When Jones had the program removed from Lisa's computer, Lisa claimed Peacock gave her permission to reinstall it for the limited purpose of looking up criminal justice sites. Lisa was given the letter of instruction for installing AOL the second time. Lisa acknowledged the warning and testified she never reinstalled it again.

In mid-January 2002, the YOPB transferred Kaslar to the Department of Corrections (now Department of Corrections and Rehabilitation). Although Peacock disclaimed at trial any knowledge in January of Kaslar's State Personnel Board complaint, Lisa testified Peacock told her the department had decided to transfer Kaslar "due to a sexual harassment suit she had pending at the time."

In late January and early February 2002, Marilyn Wolk, executive secretary to Wallace, reported to Peacock that Lisa was throwing some items of YOPB mail into the trash. Wolk admitted she did not actually see Lisa throw away any mail; she only found the mail in the trash can. She admitted a student assistant also handled the mail at the YOPB. Peacock counseled Lisa on January 31 and February 4 to let her know that continued trashing of the mail could lead to adverse action against her.

On February 5, 2002, the YOPB received a complaint that Kaslar had filed with the Department of Fair Employment and Housing (DFEH), again claiming, in part, retaliation based on her report of the kissing incident.

On February 7, 2002, Peacock claimed to have been notified by Wolk that Lisa had once again reinstalled AOL on her computer. According to Lisa, this accusation was false. She never reinstalled the AOL program after receiving the letter of instruction. Jones, who had given Lisa the letter of instruction regarding her previous installation of AOL, would have been the person to contact to determine if Lisa had reinstalled AOL on her computer. Jones testified she did not recall anyone suggesting Lisa was accessing AOL in February and no one asked her to check the computer access records at that time to verify if Lisa had done so.

On February 8, 2002, Peacock told Lisa he would be suspending her in 30 days based on the mail trashing.[9] Lisa asked if she could take a leave of absence instead because she did not want a suspension on her record. Peacock told her she needed to seek employment elsewhere. He said it "would be in my best interest to seek employment elsewhere, because I would make the office look bad if the investigators [for Kaslar's complaint] are there investigating and I was still there." Peacock warned Lisa that a suspension would be a huge black mark, making it harder to transfer to another state job. Peacock offered to give Lisa assistance in transferring to another state job. Peacock subsequently put four state job announcements on her chair.

---

[9] Peacock testified he was basing the suspension on both the mail trashing and Lisa's reloading of AOL on her computer after the letter of instruction. However, his own written notes at the time and February 21 e-mail to Wallace state the suspension was to be based on the mail trashing. There is no mention of the AOL issue.

Lisa's father talked to Peacock in early February. According to Steele, Peacock agreed at that point Wolk's accusations regarding the mail did not make sense and he did not think they were valid or legitimate. However, in a second meeting, Peacock launched into a discussion regarding the mail issue and told Steele they were going to give Lisa a specified number of days to find a new job before penalties were imposed.[10] As Peacock had previously treated the issue as nominal and incredible, Steele suggested there was something hidden Peacock was not discussing. Peacock denied there was anything else. He said Lisa had to leave.

On February 19, 2002, Jones sent Lisa an e-mail complaining that Lisa had left for the day before taking down the video conference equipment at the conclusion of the board hearings. Jones criticized Lisa for not being available to handle her duties with respect to the hearings. Two days later, on February 21, Jones sent another e-mail to Lisa complaining Lisa had again left the office without ensuring someone was available to take down the conference equipment. The e-mail also criticized Lisa's handling of document disposal, forwarding of phone calls, reading of non-work-related materials at her desk and time spent tending to personal telephone calls. The e-mail was sarcastic and demeaned Lisa's actions as "unprofessional and tacky."

Wallace received a copy of Jones's February 21 e-mail to Lisa. She e-mailed Peacock with directions to "[w]rite her [Lisa] up about this and other things that happen so we are in place we are [*sic*] with Kym [Kaslar], verbally dealing with it and no paper back up. Document it all." Wallace instructed Peacock to change Lisa's work hours. She told Peacock to change Lisa's hours to an 8:00 a.m. to 5:00 p.m. schedule "to make Lisa's job less desirable." Peacock responded to Wallace by e-mail that he had "changed her work hours (with 3 day notice per her contract) to be 8–5." Peacock also stated in his e-mail that "[i]t is only 2 1/2 weeks (I gave her 30 days to find another job) until I drop the suspension on her (for the mail in the trash that [Wolk] discovered), and I again reiterated to her that it would be in her best interest to be gone prior to that happening." Lisa wrote a memo on February 21 to Peacock responding to each of Jones's complaints in her February 21 e-mail. According to Peacock, Lisa's memo was well written and made some very cogent points. When Lisa spoke to him about Jones's criticisms, Peacock told Lisa he would speak to Jones. Peacock did not do so.

According to her father, Lisa came home during this time dismayed and despondent. She cried and was upset. Steele met with Peacock again. Peacock agreed with Steele that Jones's February 21 e-mail was unfair and not

---

[10] According to Undersecretary Beutler, the appropriate steps to take with respect to the mail problem would have been to give instructions and verbal counseling followed by a letter of instruction if the problem continued.

appropriate. But when Steele asked about giving Lisa a leave of absence, Peacock said: "It's not possible without elaborating."

Lisa took several days of sick leave in February because she could not handle the stress of the work atmosphere. She asked Peacock whether she would have to retest to obtain another state job if she resigned. Peacock confirmed she would not have to retest since she had passed probation.

On February 26, 2002, Lisa told Peacock she wanted to resign from her position at the YOPB. Peacock told her to put it into writing, which Lisa did. Peacock then asked Lisa to draft another document describing the events of the bikini contest. Peacock edited the draft Lisa provided, adding his own comments and telling her to omit any mention of the kiss. Peacock also specifically directed Lisa to include a statement that Kaslar had made comments about Lisa's body, but that Lisa was not offended. With respect to Galindo, the memo stated, in part, that Kaslar and Galindo appeared to be on a friendly basis. Lisa "didn't notice [Galindo] being more friendly to [Kaslar] over anyone else. Both seemed like they had a professional relationship, nothing out of the ordinary or anything I would perceive as sexual harassment." Lisa stated her "relationship with Mr. Galindo was strictly on a friendly basis. He would acknowledge me in the office and that was the extent of it. Kym [Kaslar] was just an acquaintance at work. I never observed Mr. Galindo being inappropriate either inside or outside of the office to anyone."

Peacock then presented Lisa with an additional note handwritten by Peacock in his own words, which he asked Lisa to type up and sign as if she had written it out. The note stated: "Memo to File. [¶] Regarding the unfortunate 'bikini contest' at McGee's, I need to clear up some misconceptions. [¶] First, Raul Galindo did not kiss me. Kym told Tony Peacock that Raul Galindo tried to kiss me, which she just made up." Lisa typed the note up and signed it, although the statement was false. She did so because she was upset by the heavy pressure during these weeks and she was under the impression Peacock was going to assist her in transferring. She still wanted to retain a state job. She thought if she resigned, Peacock would give her a reference and help her. Peacock had been consistently friendly and Lisa did not feel he criticized her.

After she resigned, Lisa contacted personnel with the YOPB and the YACA and tried to find another state job. While she waited to get another job with the state, she lived on money she inherited after her grandmother died. She denied she felt she did not need to work because of her inheritance. Lisa remained unemployed until January 2003 when she obtained a clerical job in the private sector.

Peacock provided Lisa's current contact information to the DFEH after Lisa left the YOPB's employment as part of the DFEH investigation into Kaslar's claims. Lisa told the DFEH that she had never seen anything indicating Galindo had sexually harassed Kaslar. Lisa did, however, tell the DFEH about Galindo kissing her.

## DISCUSSION

## I.

## Standard of Review

The jury in this case answered six questions on a special verdict form. As relevant to this appeal, the jury expressly found the YOPB authorized the creation of working conditions for Lisa that were so intolerable that a reasonable person in her position would have had no reasonable alternative except to resign and that Lisa resigned because of those intolerable conditions. The YOPB challenges the sufficiency of the evidence to support these findings.

Our review is governed by well-settled principles. As with any civil appeal, we must presume the judgment is correct, indulge every intendment and presumption in favor of its correctness, and start with the presumption that the record contains evidence sufficient to support the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) An appellant challenging the sufficiency of the evidence must set forth all the relevant evidence, not just the evidence favorable to the appellant, and show how the evidence does not support the judgment; otherwise, the contention is forfeited. (*Foreman & Clark Corp. v. Fallon, supra,* at p. 881; *Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96–97 [131 Cal.Rptr.2d 746]; *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290 [130 Cal.Rptr.2d 436].)

To the extent the issue is not forfeited, we are bound by the "elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; accord, *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1004 [42 Cal.Rptr.3d 68].) We cannot reweigh the evidence, but must resolve all conflicts in favor of the prevailing party.

(*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [46 Cal.Rptr.2d 427, 904 P.2d 834].) "When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford v. Southern Pacific Co., supra,* at p. 429.) We defer to the trier of fact on issues of credibility. (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 [108 Cal.Rptr.2d 34].)

## II.

## Substantial Evidence Supports the Judgment

■ FEHA makes it unlawful "[f]or any employer . . . or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." (§ 12940, subd. (h).) In order to establish a prima facie claim of retaliation under this section, a plaintiff must show (1) she engaged in a protected activity, (2) she was subjected to an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [32 Cal.Rptr.3d 436, 116 P.3d 1123] (*Yanowitz*).)

A. *Substantial Evidence Supports the Finding Lisa Was Engaged in a Protected Activity*

■ With respect to the first element of a retaliation claim, section 7287.8 of title 2 of the California Code of Regulations expressly defines "assisted in any proceeding under [FEHA]" as used in section 12940, subdivision (h), to include "[i]nvolvement as a *potential witness* which an employer . . . perceives as participation in an activity of the [DFEH] or [Fair Employment and Housing] Commission." (Cal. Code Regs., tit. 2, § 7287.8, subd. (a)(2)(B), italics added.) Kaslar filed a complaint with the DFEH based, in part, on the YOPB retaliating against her for her report of the kissing incident involving Galindo and Lisa. Lisa was a "potential witness" in such proceeding. Thus, Lisa was engaged in a protected activity so as to meet the first requirement for a claim of retaliation. The YOPB does not argue otherwise.[11]

---

[11] The YOPB does argue, however, that Lisa was not engaged in a protected activity for purposes of FEHA until she was actually listed as a potential witness in Kaslar's complaints to the State Personnel Board and the DFEH, which the YOPB claims it only became aware of in late January and early February 2002. We disagree, as we shall explain in part II.B., *post.*

B. *Substantial Evidence Supports the Finding of an Adverse Employment Action*

The YOPB, however, claims substantial evidence does not support the second element for a retaliation claim. Specifically, the YOPB contends there is insufficient evidence plaintiff suffered a constructive discharge from her employment with the YOPB and, thus, she suffered no "adverse employment action." According to the YOPB, the evidence established Lisa voluntarily resigned based on conditions that a reasonable employee would not have found intolerable or aggravated so as to amount to a constructive discharge. We disagree.

"Constructive discharge, like actual discharge, is a materially adverse employment action." (*E.E.O.C. v. University of Chicago Hospitals* (7th Cir. 2002) 276 F.3d 326, 331–332.)[12] "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. [Citation.]" (*Turner v. Anheuser-Busch* (1994) 7 Cal.4th 1238, 1244–1245 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*).)

"In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner, supra*, 7 Cal.4th at p. 1251.) To be "intolerable" or "aggravated," the employee's working conditions must be "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id.* at p. 1246.) "The essence of the test is whether, under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in plaintiff's position ' " 'would have felt compelled to resign.' " ' [Citation.]" (*Id.* at p. 1247.)

The YOPB contends the sum evidence of intolerable working conditions presented by Lisa at trial consists of the following: "(1) Co-worker Jones sent

---

[12] California courts interpreting the FEHA look to federal law interpreting title VII of the Civil Rights Act of 1964. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 475–476 [4 Cal.Rptr.2d 522]; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1454 [116 Cal.Rptr.2d 602].)

two e-mails to [Lisa]; (2) Peacock in one meeting told [Lisa] that 'it would be in my best interest to seek employment elsewhere, because I would make the office look bad if the investigators are there investigating and I was still there' and offered assistance in transferring to another state agency; (3) Peacock left four job announcements on [Lisa's] chair; (4) Co-worker Wolk was 'allowed' to go through her trash and otherwise harass her about throwing away YOPB mail; (5) Peacock told her he would give her 30 days to start doing her job properly or he would consider giving her a two to three day suspension for trashing the mail; and (6) [Lisa's] hours were going to be changed to 8:00 a.m. to 5:00 p.m."

In presenting this argument focusing on just the actions occuring during February 2002 after the YOPB's formal receipt of service of Kaslar's DFEH complaint and in presenting such limited facts solely in the light most favorable to the YOPB's position, the YOPB comes perilously close to forfeiting its substantial evidence claims on appeal. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881; *Brockey v. Moore, supra,* 107 Cal.App.4th 86, 96–97; *Western Aggregates, Inc. v. County of Yuba, supra,* 101 Cal.App.4th 278, 290.)

The YOPB disagrees, contending its actions only after late January 2002 were relevant and needed to be summarized on appeal because Lisa was not engaged in a protected activity for purposes of FEHA until she was actually listed as a potential witness in Kaslar's complaints to the State Personnel Board and the DFEH, which the YOPB claims it became aware of only in late January and early February 2002. Not so.

In *Lujan v. Minagar* (2004) 124 Cal.App.4th 1040 [21 Cal.Rptr.3d 861] (*Lujan*), a case involving retaliation under the California Occupational Safety and Health Act of 1973 (Lab. Code, § 6300 et seq.), the court held Labor Code section 6310 "applies to employers who retaliate against employees whom they believe intend to file workplace safety complaints." (*Lujan, supra,* at p. 1046.) The court reasoned that "firing workers who are suspected of planning to file workplace safety complaints [could] effectively discourage the filing of those complaints" and "allowing such preemptive retaliation would be at odds with section 6310's apparent intent—to encourage such complaints and to punish employers who retaliate against employees as a result. (*Sauers[ v. Salt Lake County* (10th Cir. 1993)] 1 F.3d [1122,] 1128 ['Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact . . .'].)" (*Id.* at p. 1045.) According to *Lujan,* "[t]o hold otherwise would create a perverse incentive for employers to retaliate against employees who they fear are about to file workplace safety complaints before the employees can do so, therefore avoiding liability under section 6310. We

do not believe the Legislature could have possibly intended such an absurd result, which could be depicted by an image of an employer following an employee and firing him or her just before the employee reached the Cal-OSHA filing window, complaint in hand. [Citation.]" (*Lujan, supra,* at pp. 1045–1046.)

■ Although *Lujan* involved interpretation of Labor Code section 6310, we are persuaded the same analysis is applicable to FEHA. "The legislative purpose underlying FEHA's prohibition against retaliation is to prevent employers from deterring employees from asserting good faith discrimination complaints . . . ." (*Akers v. County of San Diego, supra,* 95 Cal.App.4th at p. 1455.) Employer retaliation against employees who are believed to be prospective complainants or witnesses for complainants undermines this legislative purpose just as effectively as retaliation after the filing of a complaint. To limit FEHA in such a way would be to condone "an absurd result" (*Lujan, supra,* 124 Cal.App.4th at p. 1045) that is contrary to legislative intent. (See also Cal. Code Regs., tit. 2, § 7287.8, subd. (a)(2)(B) [FEHA protects "[i]nvolvement as a potential witness which an *employer . . . perceives as participation* in an activity of the [DFEH] or [Fair Employment and Housing] Commission"].) We agree with the trial court that FEHA protects employees against preemptive retaliation by the employer. We will consider the evidence of the YOPB's actions from late October 2001 onward.

Such evidence and the rational inferences from the evidence strongly suggest that from the moment YOPB learned about the kissing incident in October 2001, it feared that Lisa was a potential witness (if not a potential claimant) in a sexual harassment claim against the YOPB. That is, even though Lisa told Peacock she was not offended by Galindo's behavior, and even though it seemed unlikely Lisa herself would bring a sexual harassment claim based on the kiss, the evidence reflects the YOPB immediately perceived the kissing incident to be significant and that Lisa would be a material, corroborating witness in any sexual harassment claim involving Galindo. The evidence further suggests that Peacock and Wallace engaged in what they considered to be damage control of this important incident.

When Peacock was told by Kaslar of the kissing incident, he immediately "shut down" and told Kaslar to go back into the office and keep her mouth shut because what she knew could get Galindo fired. Peacock told Wallace about his conversation with Kaslar as soon as Wallace came into the office. Both Peacock and Wallace were concerned by an appearance of impropriety in Galindo's kiss of Lisa. They promptly alerted the highest officials in the YOPB and YACA because of the issue's political sensitivity. Galindo, Peacock, Wallace, Beutler, and Presley were all connected in some way to

each other by former employment, employment recommendations or appointments. It is a reasonable inference they were all concerned that they and the YOPB could be embarrassed and adversely affected by the fallout from Galindo's actions.

With the approval of Beutler, Peacock and Wallace drafted a strongly written letter to Galindo, for signature by Presley, warning Galindo about his actions with Lisa and sending him to sexual harassment prevention training. Both Peacock and Wallace threatened Kaslar with adverse action if she said anything about the incident.

In early November 2001, Lisa received the first memo from her then supervisor, Jones, criticizing Lisa's work performance. Lisa believed it to be inaccurate and unduly harsh. She responded to it in writing and received a disparaging reply from Jones. Both Lisa and her father spoke to Peacock about Jones's memos. Peacock agreed the memos were unfair, excessive and inappropriate. Peacock assured Lisa and Steele the memos did not constitute a performance issue or grounds for discipline, but were simply a result of Jones trying to establish her authority as a supervisor. Peacock said he would speak to Jones about the matter and get Lisa and Jones together to resolve their "personality conflict." He did neither.

Several reasonable inferences arise from this evidence. First that Peacock, aware of the discord between Lisa and her supervisor, permitted it to fester in order to encourage Lisa's resignation. Secondly that Peacock was content to leave in place unverified and possibly inaccurate criticisms of Lisa's work performance to put pressure on Lisa. And lastly, the retention of these unconfirmed criticisms would lay the groundwork for questioning her credibility in any future investigation of Galindo.

During this same timeframe, Peacock warned only Lisa and Kaslar about possible future budget cuts and told them it might be in their best interests to look for other jobs. Although Peacock claimed he met with only Lisa and Kaslar because they had the least seniority at the YOPB, an alternative inference was that Peacock wanted Lisa and Kaslar to leave the YOPB before any complaint was made about Galindo and/or any investigation of Galindo began.

In mid-January 2002, the YOPB transferred Kaslar to the former Department of Corrections. Although Peacock disclaimed at trial any knowledge at this time of Kaslar's State Personnel Board complaint, Lisa testified Peacock told her the department had decided to transfer Kaslar due to her pending sexual harassment claim. Obviously the YOPB had to have known about the

complaint in January if it transferred Kaslar because of it. Peacock's comment to Lisa clearly sent the message that the YOPB would take action against employees alleging such claims.

On February 5, 2002, the YOPB received service of Kaslar's DFEH complaint again claiming, in part, retaliation based on her report of the kissing incident between Galindo and Lisa.

Just three days later Peacock informed Lisa he would be suspending her in 30 days based on her trashing of YOPB mail.[13] Peacock said this despite his admissions to Lisa's father that such allegations did not make sense and he did not think they were valid or legitimate and even though the disciplinary steps preceding a suspension based on the trashing of mail (a letter of instruction followed by a letter of reprimand) had not been taken. When Lisa asked if she could take a leave of absence instead because she did not want a suspension on her record, Peacock told her, without any apparent qualification, she needed to seek employment elsewhere. He told her it "would be in my best interest to seek employment elsewhere, because I would make the office look bad if the investigators are there investigating and I was still there." Peacock warned Lisa that a suspension would be a huge black mark on her state employment record, making it harder to transfer to another state job. Peacock told Lisa's father that Lisa "has to leave."

A reasonable understanding of these events is that Peacock, in his capacity as her supervisor, intimidated and threatened Lisa, a young employee new to state service, with a baseless and inappropriate level of disciplinary action that would detrimentally affect her future employment in state service because he wanted her out of the way of DFEH investigators. He concealed his retaliatory motive behind a friendly offer to assist her in transferring.

On February 19 and 21, 2002, Jones sent e-mails to Lisa further criticizing her work performance. Lisa responded with a well-written memo that Peacock felt made some very cogent points, but Peacock did not speak to Jones despite his assurances to Lisa that he would. Instead, Peacock changed

---

[13] YOPB claims in its brief that Peacock told Lisa he "would give her 30 days to start doing her job properly or he would consider giving her a two to three day suspension." YOPB's citations to the record in support of this claim reflect Peacock told Lisa he "would have to give her" the suspension within 30 days, that he "would be suspending her for two or three days," that he "would think about suspending her for two or three days," that it would take about 30 days to process the suspension, that he would be arriving at a decision in 30 days, and that he would "drop the suspension on her" at the end of 30 days. We have found no evidence in the record Peacock gave Lisa 30 days to start doing her job properly or he would consider a suspension. The evidence on the whole does not show the threatened suspension was contingent; rather it was portrayed to Lisa and her father, as well as to Wallace, as a certainty unless Lisa left the YOPB before it became effective.

Lisa's hours, at the direction of Wallace, "to make Lisa's job less desirable." Peacock "again reiterated" to Lisa that it would be in her best interest to be gone before the suspension became effective, essentially reminding her that the clock was ticking and it would soon be very difficult for her to continue pursuing her state service career.

Lisa took sick leave because of the stress and then, when she returned, she told Peacock she wanted to resign. Peacock told her to put it into writing, which Lisa did.

Peacock then did two further Machiavellian things. He asked Lisa to draft another document describing the events of the bikini contest that omitted any mention of the kissing incident, denied any observation of sexual harassment of Kaslar by Galindo, and portrayed Kaslar as herself making comments that could be considered inappropriate. Then he asked Lisa to type up a note Peacock had written that falsely denied the kissing incident had happened. These actions, although taken after Lisa expressed her intent to resign, corroborate Lisa's claim that the motive behind Peacock's pressure on her to quit was to undercut Kaslar's DFEH proceeding. The evidence suggests Peacock hoped the DFEH investigators would rely on Lisa's memos and not question Lisa further or if they questioned Lisa further and she told them something different, the memos would be available to contradict her statements.

Viewing the totality of these circumstances, substantial evidence supports the jury's finding of intolerable or aggravated working conditions. Over the course of four months following the bikini contest, pressure was steadily ramped up on Lisa, a young woman new to state service with aspirations of a state career, in an effort to cause her to leave the YOPB before DFEH investigators arrived. Work performance issues of arguably dubious merit were brought to the attention of management, but left uninvestigated and unresolved. Lisa was reminded of the budgetary crisis that might require layoffs and told to start looking for other work. Lisa was told Kaslar had been transferred because of her sexual harassment complaint. By inference, it was made clear to Lisa that she would be subject to similar action if she became involved in Kaslar's complaint. Lisa was then threatened with an unjustified, inappropriate and accelerated level of discipline, a suspension, and repeatedly told the way to avoid a "huge black mark" on her state service record would be to transfer before the suspension could be effective. Her work schedule was manipulated when her hours were changed in an intentional effort to make her job less desirable. We do not have to determine whether each individual action was an intolerable condition because the actions taken together (*Yanowitz, supra,* 36 Cal.4th at p. 1055) support a finding that Lisa was unlawfully coerced into resignation. (*Turner, supra,* 7 Cal.4th at p. 1246.)

"[A] reasonable employee in plaintiff's position ' " 'would have felt compelled to resign.' " ' [Citation.]" (*Id.* at p. 1247.)

Contrary to the argument of the YOPB, this case is not analogous to *Fitz v. Pugmire Lincoln-Mercury, Inc.* (11th Cir. 2003) 348 F.3d 974 (*Fitz*) or *Jones v. Department of Corrections* (2007) 152 Cal.App.4th 1367 [62 Cal.Rptr.3d 200] (*Jones*). In *Fitz*, the court concluded a withdrawn reprimand, statements by coworkers to the plaintiff revealing management's supposed secret intent to fire him, nonderogatory cartoons that were not condoned by the employer, a job offer, and a baseless claim of unequal pay did not amount to intolerable working conditions so as to support a finding of constructive discharge. (*Fitz, supra,* at pp. 977–978.) In *Jones*, the court concluded the plaintiff had failed to prove an adverse employment action for purposes of FEHA because she never experienced a loss or reduction in her classification, position, salary, benefits or work hours and her employment was not terminated. (*Jones, supra,* at p. 1381.) She did not establish a constructive termination because in complaining about the actions of her male coworkers she failed to show "her employer intentionally created or knowingly permitted working conditions so intolerable or aggravated that a reasonable employee in her position would have felt compelled to resign. [Citation.]" (*Ibid.*)

■ In contrast here, Lisa established Peacock intentionally and wrongfully held over her head several uninvestigated and allegedly false work performance criticisms, the budget crisis, the transfer of a coworker who had filed a sexual harassment complaint and an inappropriate threat of suspension that would damage her future career with the state in order to coerce Lisa into leaving the YOPB before DFEH investigators arrived. He changed her hours in an intentional effort to make her job less desirable. That he acted subtly and deceptively, as an amicable family friend, purportedly with her best interest in mind in supporting her efforts to transfer jobs, does not change the underlying reality of his actions. While we agree a constructive discharge may be found based on a supervisor constantly yelling, screaming, intimidating, or disparaging a plaintiff (*Juell v. Forest Pharmaceuticals, Inc.* (E.D.Cal. 2006) 456 F.Supp.2d 1141, 1153; *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1170 [104 Cal.Rptr.2d 95]), we do not believe such actions are a necessary prerequisite to a finding of constructive discharge.

The YOPB contends, however, there is no substantial evidence the YOPB authorized any intolerable working conditions. The YOPB claims "no official acts by Peacock 'forced' [Lisa] to quit, or underlay her alleged constructive discharge. At most, he encouraged her to transfer to another state agency and offered to assist her, but [he] took no official action to effect her transfer." The YOPB claims there was no evidence the two e-mails from Jones in February

2002 were sent at the direction or on the authorization of a supervisor. Bizarrely, the YOPB claims Peacock's statements to Lisa and even his threatened suspension were not official acts of the YOPB. The YOPB asserts Peacock changed Lisa's hours simply in an effort to address issues raised by a coworker and asked her only to work normal state employment hours in order for her to cover her responsibilities.

We need not linger over these claims. The YOPB's argument ignores much of the evidence and presents other evidence in the light most favorable to its position. In reviewing the record for substantial evidence, however, we are required to review the entire record in the light most favorable to the judgment. (*Crawford v. Southern Pacific Co., supra,* 3 Cal.2d 427, 429; *Scott v. Pacific Gas & Electric Co., supra,* 11 Cal.4th 454, 465.) Here the evidence supports the finding that the YOPB coerced Lisa to resign through the actions and inactions of Peacock, Lisa's supervisor, as approved, orchestrated and encouraged by Wallace, the executive officer of the YOPB. Substantial evidence supports the jury's finding that the YOPB authorized the actions that compelled Lisa to resign.

We likewise reject the YOPB's contention that Lisa "did not present substantial evidence that she resigned because of intolerable conditions at the YOPB." (Capitalization omitted.) Pointing to the evidence that Lisa lived with her father, that she received an inheritance from her grandmother shortly before her resignation, and that in her deposition she said she did not seek a job until June 2002 because she had money saved up and from her inheritance (the truth of which statement she denied at trial) the YOPB argues Lisa "did not want to work, did not need to work, and that is why she quit." This is a reprise of the YOPB's trial argument. The jury was free to, and apparently did, reject the YOPB's interpretation of the evidence.

We conclude substantial evidence supports the jury's finding of an adverse employment action authorized by the YOPB.

C. *Substantial Evidence Supports the Finding of a Causal Link Between Lisa's Potential Participation as a Witness in Kaslar's DFEH Proceeding and the Adverse Employment Action*

The third element of a FEHA retaliation claim is that there is a causal link between the protected activity and the adverse employment action. (*Yanowitz, supra,* 36 Cal.4th at p. 1042.) The YOPB claims insufficiency of the evidence to support a finding of this third element.

The YOPB reasons as follows: "According to [Lisa], Galindo kissed her on the cheek one time. [Lisa] was not offended by or uncomfortable with

Galindo's greeting. [Lisa] felt that Galindo was friendly and professional, and he never made her feel uncomfortable. The YOPB knew this when it received Kaslar's complaints in January and February 2002, because Lisa shared this information with Peacock in October 2001. For this reason, the YOPB knew that [Lisa] would help it to refute Kaslar's claim. Thus, far from [being] motivated to retaliate against [Lisa], the YOPB was motivated to ensure that she talked to the DFEH. [¶] In keeping with that motivation, the YOPB provided [Lisa's] personal contact information to the DFEH during its Kaslar investigation and after [Lisa] had resigned." (Record citations omitted.) Given that Lisa had only exculpatory information regarding any allegation of sexual harassment against Galindo, the actions of the YOPB cannot have been taken in retaliation against her because of her status as a potential witness in Kaslar's DFEH proceeding.

In fact, Lisa testified Galindo asked her at work about her participation in bikini contests, expressed an interest in attending one of her contests, did attend such a contest, and at the conclusion of the contest tried to kiss Lisa on the mouth. She received the kiss on her cheek only because she turned her head. Galindo's actions were not quite as innocent as the YOPB now portrays. Peacock, Wallace, and Beutler all immediately understood the appearance of impropriety in Galindo's conduct and took immediate action to prevent his repetition of such conduct. Admittedly Lisa said she was not offended by the kiss. Nevertheless, she was still a percipient witness to Galindo's conduct, which was potentially strong, prejudicial corroborative evidence in the event any sexual harassment claims were raised, as they apparently were by Kaslar. Substantial evidence supports a conclusion the YOPB understood the situation just this way and that it took action against Lisa on that basis. Indeed, this is the best explanation of Peacock's comment to Lisa that it "would be in [her] best interest to seek employment elsewhere, *because* [she] would make the office look bad if the investigators are there investigating and [she] was still there." (Italics added.) The YOPB's disclosure of Lisa's contact information to the DFEH after her resignation could have a number of explanations and does not necessarily change the conclusion that the YOPB's actions against Lisa were motivated by her status as a potential witness in a DFEH proceeding.

## III.

### The Attorney Fees Award

The YOPB contends the postjudgment order awarding Lisa attorney fees must be reversed if this court reverses the jury's verdict on the underlying judgment. We are not reversing the judgment, but affirming it. It follows that we shall also affirm the order awarding attorney fees.

## DISPOSITION

The judgment and the order awarding attorney fees are affirmed. Costs on appeal are awarded to respondent. (Cal. Rules of Court, rule 8.278(a).)

Davis, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied June 3, 2008.