Filed 8/27/14  Torres v. City of Los Angeles CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEDRO TORRES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Appellant. | B248114 <br><br> (Los Angeles County <br> Super. Ct. No. BC423468) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  James R. Dunn, Judge.  Affirmed.

Michael N. Feuer, City Attorney, Paul L. Winnemore, Deputy City Attorney, for Defendant and Appellant.

Law Offices of Gregory W. Smith, Gregory W. Smith and Boris Konon; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Plaintiff and Respondent.

_____

Pedro Torres, a former sergeant in the Los Angeles Police Department (the Department), brought this action against the City of Los Angeles under the Fair Employment and Housing Act (FEHA) alleging constructive discharge in retaliation for supporting a fellow officer in that officer's opposition to racial discrimination by their supervisor. A jury awarded Torres $2.8 million in damages. The City appeals claiming the verdict is not supported by substantial evidence. We affirm.

## FACTS AND PROCEEDINGS BELOW

Torres and Robert Hill were officers assigned to the Department's Newton Division. They frequently heard their immediate supervisor, Sergeant Gil Curtis, use derogatory terms and make disparaging comments in reference to African-Americans and Hispanics. On one occasion Curtis referred to Torres in his presence as "a lazy Mexican."

In March 2005, Hill initiated a misconduct complaint against Curtis with the Department's Internal Affairs Division (IAD) accusing Curtis of making racist remarks toward other officers.

In January 2006, Hill filed a complaint concerning Curtis's racist remarks with the Department of Fair Employment and Housing (FEAH).

Torres corroborated Hill's allegations in an interview with IAD investigators in February 2006.

Prior to Torres's involvement in Hill's complaint against Curtis, Torres himself had been the subject of an FBI and IAD investigation to determine whether he had any illicit involvement with a murder suspect named George Torres. Torres admitted he knew George Torres and believed that he had contacts in city government through which he was able to obtain confidential information. During that investigation Torres was asked what he knew about two gang members, "Ra-Ra" and "Nacho." Torres told the interviewer that a friend of his had introduced him to Ra-Ra in a bar four years earlier and that he knew that Ra-Ra was a "shot caller" with the Ghetto Boys gang. Torres further stated that he had never met Nacho and didn't know what he looked like but that

2

he had information that Nacho and Ra-Ra were friends and both were acquainted with George Torres. (Torres's interview was surreptitiously recorded by the IAD investigator.) Finding no evidence that Torres was involved in any criminal activity, the FBI and the IAD closed their criminal investigations of Torres.

In March 2006, a month after Torres testified in support of the charges of racism against Curtis, the IAD launched an administrative investigation of Torres to determine whether he had made false or misleading statements to the officers conducting the criminal investigation, particularly with respect to what he knew about Ra-Ra and Nacho. The IAD captain who ordered the administrative investigation was a good friend of a Captain who was a close friend of Curtis.

One day in August 2006, Torres called in sick. His supervisor claimed he did not believe that Torres was sick and referred the matter to the IAD for investigation. After investigating the charge the IAD detective assigned to the case concluded there was insufficient evidence to support the allegation that Torres faked his illness. The detective later told Hill that the Department was attempting to establish a pattern of misconduct on the part of Torres in order to discharge him and that the detective had been told by "certain people" that they wanted him "to do his best to make the complaint stick."

In December 2006, Torres was interviewed by Hill's attorney regarding Curtis's racist remarks about Hispanic and African-American officers. Torres corroborated Hill's description of Curtis's conduct. Hill's attorney gave a recording of Torres's interview to the City's attorney.

In January 2007, Hill filed an action under FEHA against the City seeking damages for the Department's harassment and creation of a hostile work environment in retaliation for his complaints about Curtis.[1]

---

[1]    In September 2008, a jury awarded Hill $3.1 million in damages. The judgment was affirmed by Division Five of this court in an unpublished opinion. (*Hill v. City of Los Angeles* (March 8, 2010, B214210.)

In April 2007, Torres was driving alone in his patrol car when he heard a broadcast stating that a woman had been assaulted and was inside a white van with the perpetrator. Torres spotted a parked car whose license number matched the license number given in the broadcast. After radioing for help, Torres pulled alongside the van so that his driver's side window was next to the van's driver's side window. Torres pointed his gun at the van's driver and ordered him several times to turn off his engine. The driver ignored Torres's commands. Torres got out of his vehicle and approached the van with his gun drawn. As he stood next to the van, he could see a woman lying in the passenger's seat with blood and bruises on her face. She appeared to be unconscious. The van suddenly sped off and Torres fired six shots, five hit the van's back tires and one struck the rear of the van. Officers responding to Torres's call for help were able to stop the van, detain the driver and rescue the victim.

The following day the Department issued a news release praising Torres for "a job well done" and stating that he had saved the woman's life. A few days later, however, Department supervisors declared that Torres had acted "out of policy" in shooting at the van. Torres suffered a five-day suspension without pay. There was testimony at the trial that the Department's Deputy Chief ordered the captain who investigated the shooting "to make this shooting out of policy[.]" The Deputy Chief possessed Torres's record and thus knew that Torres supported Hill's complaint against Curtis. The Deputy Chief was also a good friend of the Captain who was a good friend of Curtis. The decision finding Torres violated Department policy in shooting at the van occurred shortly after Torres told a detective investigating Hill's charges against Curtis that he had heard Curtis making racially derogatory comments.

Meanwhile the Department proceeded with its investigation of Torres's relationship to George Torres, Ra-Ra and Nacho. The IAD detective looking into the matter submitted a report to his superior, a captain, concluding that Torres had been untruthful in discussing his knowledge of the two gang members and their relationship to George Torres. On February 22, 2008, the captain determined that Torres made

4

inconsistent statements regarding his knowledge of Ra-Ra and Nacho and recommended that Torres be sent to a Board of Rights hearing for discharge.

On or about February 21, 2008, Torres received a call from a detective ordering him to appear at the City Attorney's office for an interview regarding Hill's accusations against Curtis. The detective told Torres: "We want to know which side you're on[.]"

In March 2008, the Department ordered Torres to surrender his gun and badge and suspended him without pay pending the Board of Rights hearing. Evidence at trial showed that when an officer is sent to a Board of Rights hearing for possible termination the usual practice is to take the officer's gun and badge but this is not always the case. The evidence showed that other officers accused of making false and misleading statements in investigations were not relieved of duty pending their hearings.

As part of the Board of Rights process, the Department gave Torres a transcript of his original interview with the IAD officer inquiring into his knowledge about George Torres, Ra-Ra and Nacho. Torres thus learned that his identity and his statements to the IAD about George Torres had been recorded and may have been turned over to the attorney for a man accused of five murders who had a pending federal criminal trial.

Concerned for his safety and the safety of his family, Torres requested that the Department either return his firearm, issue him a concealed weapon permit or station officers near his home. The request went to the same captain who had initiated the Board of Rights hearing to terminate Torres. The captain acknowledged that George Torres's lawyer could have shown the interview to George Torres and, if so, it was reasonable for Torres to be concerned about his safety and that of his family. The captain nevertheless concluded that "there was [not] much credibility" to the threat. Torres request for protection was forwarded to a deputy chief who denied it without explanation. The Department also denied the protection request from Hill whose name Torres mentioned in his IAD interview.

The Department treated Torres differently while his Board of Rights hearing was pending from the way it treated another officer involved in the Curtis investigation while

5

his hearing was pending. This officer served with Torres and Hill in the Newton Division. In 2004, this officer allegedly informed Torres that he was under investigation by a drug enforcement task force within the Department. Evidence at trial showed that such a disclosure constituted serious misconduct. When the disclosure came to light an IAD investigator recommended that the officer be referred to the Board of Rights for termination. After that recommendation, but before the case was sent to the Board of Rights, the officer testified favorably to the Department in Hill's discrimination suit against Curtis. The officer was never referred to the Board of Rights for termination but, instead, was given a 10-day suspension that he never served.

Beginning in March 2008, when the Department relieved Torres of duty and sent him home without pay, Torres began experiencing symptoms resembling a heart attack, extreme surges of adrenaline, difficulty sleeping, and rectal bleeding.

In August 2008, the Board of Rights ruled unanimously that the allegations against Torres were "out of statute," meaning the Department had exceeded the one-year limit in which to investigate an administrative complaint. The Board dismissed the charges against Torres.

In September 2008, the Department informed Torres that he could return to work.

Torres did not return to work. He testified that by September 2008 he had lost trust in the Department and felt the Department did not protect him. In addition, the symptoms he began experiencing in March 2008 continued to increase to the point where, in September 2008, he sought treatment from Dr. Phillip Bowman, a psychiatrist with expertise in mood and anxiety disorders.

Dr. Bowman diagnosed Torres as suffering from symptoms consistent with a panic disorder: frequent panic attacks with physical symptoms such as sweaty palms, shortness of breath, nausea, dizziness, racing thoughts, as well as fear of future panic attacks which impaired Torres's ability to go out and do things. Dr. Bowman prescribed continued psychotherapy and anti-anxiety medication and placed Torres on temporary disability based on the panic disorder diagnosis.

6

Torres's symptoms continued to increase to the point Dr. Bowman formed the opinion that Torres was no longer able to do his work as a police officer. His symptoms were so severe as to impair his ability to focus, concentrate, and follow directions. At this point, Dr. Bowman concluded that Torres suffered from Post-Traumatic Stress Disorder, a severe, chronic condition. Dr. Bowman determined that Torres's stress disorder was directly related to his working conditions at the Department, particularly a lack of trust in the Department regarding protection at work. Dr. Bowman also stated that Torres's stress disorder was caused by the fact Torres could not predict how he would be treated at work in the face of the repeated accusations and allegations. As an example, Dr. Bowman described how the Department gave Torres a work schedule which typically would change month to month making it impossible for Torres to make plans. Dr. Bowman also pointed to the manner in which the Department first lauded Torres as a hero for saving the life of the kidnap victim, and then reprimanded him for responding in the proper manner. This uncertainty about how he would be treated at work heightened Torres's stress and anxiety, causing him to develop a distrust of the Department.

By June 2010, Dr. Bowman concluded that Torres's chronic condition prevented him from ever returning to work for the Department, and recommended that he be placed on permanent disability. The Department denied Torres's application for a disability pension. Torres successfully appealed that decision and ultimately received a disability pension beginning on November 18, 2010. Dr. Bowman recommended that Torres continue to receive psychiatric treatment, but Torres was unable to afford it on his pension.

Hill testified that he witnessed Torres's deteriorating mental condition. When Hill would go to Torres's house to check on him, Torres would refuse to answer the door if Hill had anyone with him. Hill saw that Torres was sleeping upstairs in a bathtub out of fear for his life. Asked to describe the difference he observed in Torres between 2004

7

and the time of trial in November 2012, Hill responded: "In 2004 he was a person on a mission to change the world and his mission now is just to survive."

Torres brought this action against the City alleging his superiors in the Department retaliated against him and caused his constructive discharge because he engaged in the protected activity of supporting Hill's complaints against their supervisor, Curtis, for making derogatory remarks and racial slurs against African-Americans and Hispanics. In a special verdict, the jury agreed with Torres's contentions and awarded him $211,021 for past economic loss, $1,670,997 for future economic loss, and $1,000,000 for past and future non-economic loss.

The court denied the City's motions for judgment notwithstanding the verdict and a new trial on damages and this timely appeal followed.

The City contends that the court should have granted its motions for judgment notwithstanding the verdict and for a new trial because substantial evidence does not support the jury's finding the adverse employment actions were motivated by retaliatory intent. Alternatively, the City argues it is entitled to a new trial on damages because there was insufficient evidence of constructive discharge to support the award for economic damages.

## DISCUSSION

### I. STANDARD OF REVIEW.

Well-settled principles govern our review.

"A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] The moving party may appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict, or both. [Citation.] As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

8

In determining whether substantial evidence exists to support the jury's findings, we view all the factual matters in the light most favorable to the prevailing party, resolving all conflicts and indulging all reasonable inferences from the evidence to support the judgment. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465.) "Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment ." (*Howard v. Owens-Corning* (1999) 72 Cal.App.4th 621, 630-631.) The testimony of even a single witness may constitute substantial evidence in support of the judgment. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) Finally, "[e]ven in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Howard v. Owens Corning, supra,* 72 Cal.App.4th at p. 631.)

## II. FEHA PROTECTIONS AND THE ISSUES IN THIS CASE.

Government Code section 12940, subdivision (h)[2] provides that it is an unlawful employment practice for any employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this [section] or because the person has filed a complaint, testified, or assisted in any proceeding under this [section]." Among the "practices forbidden" by section 12940 is "discriminat[ion] against the person in compensation or in terms, conditions, or privileges of employment" because of the person's race, national origin or ancestry. (§ 12940, subd. (a).)

---

[2]     All statutory references are to the Government Code.

9

The City does not dispute that Torres engaged in protected activity under section 12940, subdivision (h) when he testified in support of Hill's administrative and judicial complaints about Curtis's racially derogatory remarks.  Nor does the City deny that it subjected Torres to adverse employment actions when it suspended him for five days without pay as punishment for the shooting incident, relieved him from duty without pay and suspended his authority to carry a gun and a badge pending the Board of Rights hearing and denied him and his family protection from murder suspect George Torres.  Finally, the City does not dispute that a constructive discharge is an adverse employment action.

The City denies, however, that there is substantial evidence that it retaliated against Torres for engaging in protected activity or that its adverse employment actions caused Torres's constructive discharge from employment.

## III.    SUBSTANTIAL EVIDENCE SUPPORTS THE JUDGMENT.

### A.    Constructive Discharge.

Constructive discharge is a doctrine that transforms what is ostensibly a voluntary resignation from employment into a dismissal.  (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251.)

To establish a constructive discharge, Torres had to prove that the Department either intentionally created or knowingly permitted working conditions that "were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in Torres's position would be compelled to resign."  (*Turner v. Anheuser-Busch, Inc.*, *supra,* 7 Cal.4th at p. 1251.)  "The essence of the test" for constructive discharge "is whether, under all of the circumstances, the working conditions are so unusually adverse that a reasonable employee . . . ""'would have felt compelled to resign.'""  [Citation.]"  (*Id*. at p. 1247.)  Whether working conditions have reached the level of "unusually adverse" is a question of fact.  (*Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1056.)  Here, the jury found that they had.

10

The City argues that the evidence does not support the jury's finding of constructive discharge because there is nothing "intolerable" or "aggravated" about investigating and disciplining employees; this is a normal part of any business.

The City's argument misses the mark. It may well be a normal part of business to investigate and discipline employees, but when these actions are as persistent and the causes as dubious as in this case, the jury could reasonably find the work situation "intolerable." Here, the Department subjected Torres to a series of investigations and disciplinary actions of questionable merit all of which occurred after Torres testified in support of Hill's charges of racism against Curtis. Moreover, the evidence showed that the way Torres was treated while awaiting his Board of Rights hearing differed significantly from the treatment of another Newton Division officer who was also recommended for a Board of Rights hearing but who did not support the racial discrimination charges against Curtis. Torres was stripped of his badge and his gun and sent home for five months to await his hearing. The other officer was never sent to the Board of Rights and instead was given a 10-day suspension that he never served. Moreover, Torres's superiors were blatant about their attempt to establish grounds to fire him because of his support of charges against Curtis. Investigators conducting proceedings involving Torres were told to "make the complaint stick" and to "make [the] shooting out of policy." One detective told Torres, referring to the charges against Curtis, "We want to know which side you're on."

Finally, given the danger of police work, Torres needed to be able to place trust in his fellow officers and supervisors. Dr. Bowman testified that Torres's stress disorder was caused by his inability to predict how he would be treated at work in the face of the repeated accusations and allegations against him. He explained that this uncertainty about how he would be treated at work, in turn, heightened Torres's stress and anxiety, causing him to develop a distrust of the Department in general.

As a fallback position, the City contends that Torres did not prove his working conditions were intolerable or aggravated "at the time of [his] resignation." (*Turner v.*

11

*Anheuser-Busch, Inc.*, *supra,* 7 Cal.4th at p. 1251). The City argues that in August or September 2008, when Torres made his decision to resign, no intolerable or aggravated conditions existed because no misconduct charges were pending against him and the Department had informed him that he could return to work. But the jury reasonably could infer that the retaliatory animus that led to Torres's constructive discharge in September 2008 existed after that date. Indeed, it was in September 2008 that Torres testified in Hill's racial discrimination action and the jury awarded Hill over $3 million in damages against the City thus providing an even stronger motivation for retaliation against Torres. There was no evidence that the Department took any steps to curb the hostile and inappropriate treatment of Torres by those who sought to punish him for backing Hill's charges of racial discrimination against Curtis, their supervisor.

Viewing the evidence in the light most favorable to the verdict, there is substantial evidence to support the jury's finding that Torres reasonably believed the pattern of harassment by the Department's management would continue.

### B. Retaliation.

To establish retaliation under the FEHA, Torres had to prove by a preponderance of the evidence that he engaged in protected activity, the Department took an adverse employment action against him, and the protected activity was a motivating reason for the Department's adverse action. (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1533. The City agrees that Torres's testimony supporting the charges of racism against Curtis was a protected activity under FEHA and we concluded above that Torres suffered a constructive discharge. The remaining issue is whether there is a causal link between the protected activity—testifying in support of the charges of racism against Curtis—and the adverse employment action—constructive discharge. (*Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1260.)

Every one of the investigations and disciplinary actions against Torres occurred after Torres testified in support his fellow officer's charges of racial discrimination against their supervisor. (1) The IAD commenced an administrative investigation into

Torres's relationship with a murder suspect and two gang members after a criminal investigation by the IAD and the FBI found no evidence of wrongdoing on Torres's part. (2) A supervisor's complaint that Torres had faked a sick leave claim was found to have insufficient factual support but the investigator was told by his superiors to "make the complaint stick" anyway. (3) The captain investigating the incident in which Torres fired at the van of an escaping kidnapper was told by his supervisor to "make this shooting out of policy." (4) Charges that Torres gave investigators misinformation in their criminal probe described above were filed with the Board of Rights even though the charges were time-barred by several years.

The jury could reasonably infer from this evidence that the investigations and punishment of Torres were in retaliation for his commitment to supporting the racism charges against Curtis.

### DISPOSITION

The judgment is affirmed. Respondent is awarded his costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

JOHNSON, J.

MILLER, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13